**BOAZ SPINNING COMPANY, a subsidiary of Standard-Coosa-Thatcher Company, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 24950.

United States Court of Appeals
Fifth Circuit.

May 31, 1968.

Frank A. Constangy, Constangy & Prowell, Atlanta, Ga., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Lawrence M. Joseph, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Gary Green, William J. Avrutis, Attys., N.L.R.B., Washington, D. C., for respondent.

Before THORNBERRY, AINSWORTH and DYER, Circuit Judges.

DYER, Circuit Judge:

The petitioner, Boaz Spinning Company, a subsidiary of Standard-Coosa-Thatcher Company, seeks review of an order[1] issued against it finding that petitioner had violated section 8(a) (1) of the National Labor Relations Act[2] by discharging employee R. C. Alexander for engaging in protected activity within the meaning of section 7 of the Act. The Board, by cross-petition, seeks enforcement of its order.

The essential facts are not in dispute. In April, 1966, the union began a campaign to organize the employees at the company plant. Alexander signed a union authorization card and solicited other employees to sign up. On June 7, 1966, the union filed a petition for a Board conducted election and an election agreement was entered into by the company and the union on June 29, 1966. During this time Alexander distributed union literature at the plant gates. On June 30, 1966, plant manager Pride distributed regular pay and vacation checks to the employees with the remark that the employees didn't have to belong to the damn union to receive the vacation check.

On July 13, 1966, Pride assembled the day shift of almost forty workers in the plant warehouse for a speech. Before the meeting began, Alexander asked Pride from the floor if it would be an open meeting. Pride replied that it would not, that employees could not make speeches, but that after Pride had made his speech he would try to answer any employee questions. Alexander sat down without any objection. Pride then made a prepared speech, in which he recounted some disadvantages of union membership and some possible unpleasant economic consequences of unionization of the plant. It was found by the Examiner and conceded by the Board that the speech was legitimate persuasion protected by section 8(c) of the Act.

Pride then asked if any of the workers had questions. Alexander stood up, walked up in front of Pride and said he had a few questions but that "first of all, I want you to know that I am 100 percent for the Union, I am one of the main men on the union committee. Now you have told us what the Union cannot do for us; I want to tell you what the Union can do." Pride told Alexander to sit down, saying, "I told you I would answer your questions, but you cannot have the floor," that "you did not invite me to your meetings; now I am having mine and you are not invited to make a talk here. You are still an employee of Boaz Spinning Company, please sit down over there until I finish." Alexander sat down momentarily and then jumped up again and, pointing his finger at Pride, said loudly, "I want you to know that you are no different than Castro; Castro told the people in his country if they did not like the way he was running it to pack up and leave, and you tell people at Boaz Spinning Company if they do not like the way you are running the plant to punch out and go home." Pride immediately replied, "R. C., that is insubordination, you are fired." He told one of the foremen to take Alexander from the room and clock him out. On his way out Alexander said, "Yes, I will go, but I want to tell you I am not the only one who feels that way about it; there are many others who feel the same way." After Alexander's departure Pride remarked, "Now that we have got rid of that hot head, maybe we can go on with our meeting." After one employee asked about the election and Pride answered him there were no further questions and the meeting was adjourned.

1. 165 N.L.R.B. No. 103.

2. 29 U.S.C.A. § 158(a) (1).

It should be emphasized that when Alexander first tried to make a pro-union speech he was told to sit down and hold his *questions* until the end. He sat for a moment, then jumped up and again started to make a speech beginning with the Castro remark.

The Trial Examiner found that "Alexander made the Castro remark in a deliberate and defiant manner, and that his blunt disparagement of his employer came from some inner impulse of vindictiveness or malice not warranted by anything shown in the record," and concluded that the Castro remark "was a form of flagrant insubordination and disloyalty which takes it clearly outside the protection of the Act, and warranted the immediate discharge of Alexander."

The Board, in finding an invasion of section 7 rights, rejected the Trial Examiner's interpretation of Alexander's outburst saying, "We believe that the Trial Examiner attributed more to the Castro remark than Alexander intended or could reasonably have been understood by Pride and Alexander's fellow employees * * *. Alexander's remarks did not have a life of its [*sic*] own * * * Alexander's comment when Pride ordered him to sit down had nothing to do with Pride's general political convictions, but portrayed Pride as an industrial dictator [3] who, while seeming to be willing to submit to questioning, was in fact unwilling to hear both sides of the question. * * * Alexander in a moment of emotional stress used an unfortunate figure of speech."

Thus, the question in this case "is not the usual one of whether the Board's findings on disputed facts are supported by substantial evidence in the record as a whole, e. g., N.L.R.B. v. Brown, 1965, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.

2d 839, but whether the inferences drawn by the Board [contrary to those drawn by the Examiner] from the uncontroverted facts in this case are reasonable ones." N.L.R.B. v. Suniland Furniture Co., 5 Cir. 1967, 387 F.2d 123 (Dec. 15, 1967).

■ Necessarily, when there are differing views about the interpretation or significance of undisputed facts, each case must be decided on its particular circumstances,[4] keeping in mind that labor disputes are ordinarily heated affairs, and that confrontations between management and employees during an organizing campaign cannot be held to the standards of cool, analytical impartiality characteristic of the debating society. Cf., Linn v. United Plant Guard Workers, 1966, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed. 2d 582. A line must be drawn between the rights of the protagonists. Undoubtedly "flagrant conduct of an employee, even though occurring in the course of section 7 activity, may justify disciplinary action by the employer. On the other hand, not every impropriety committed during such activity places the employee beyond the protective shield of the act. The employee's right to engage in concerted activity may permit some leeway for impulsive behavior, which must be balanced against the employer's right to maintain order and respect." N.L.R.B. v. Thor Power Tool Company, 7 Cir. 1965, 351 F.2d 584, 587. Unquestionably, Alexander was insubordinate; however, it seems equally clear that his short speech, although intemperate, was of a pro-union character. Thus, as a union activist making a pro-union speech, he can avail himself of the protective shield of section 7 so long as his insubordination was not so flagrant as to take him beyond the pale.

3. The printed record uses the word "director" while the Board's brief uses the word "dictator" when quoting from the record.

4. The many cases cited by the Board to support the broad generalization, albeit abstractly sound, that an employee who presents objections or grievances to management, protesting against company attitudes on policies regarding employee self-organization, is normally protected against reprisal, are therefore not helpful in the instant case.

Both the Trial Examiner and the Board, while noting that Alexander was an active union adherent, declined to rule that his discharge was an act of discrimination because of his union activities under section 8(a) (3) of the Act, and both were unpersuaded by the contention of General Counsel that the discharge of Alexander for insubordinate conduct was a pretext to hide a discriminatory motive in violation of section 8(a) (3) of the Act. The Board nevertheless found a violation of section 8(a) (1) of the Act in the discharge of Alexander because he had not engaged in any misconduct which would warrant a forfeiture of the statutory protection normally accorded an employee who seeks to assist a union. We disagree.

The union lost the election held on July 28, 1966. No protest was made and the results of the election were certified on August 5, 1966. There was no allegation that the company, at any time, interfered with, restrained or coerced any of its employees in any manner except for this single incident concerning Alexander's discharge. The Trial Examiner credited Pride's testimony that he "discharged Mr. Alexander because he slandered me. At the time of that meeting I had a son who was en route to Viet Nam and when he called me Castro he called me a Communist SOB and I am not going to take that from any one." Pride further testified that Alexander's union activities had nothing to do with his discharge, that Alexander could have "asked me questions all day long and I would have endeavored to answer them." Pride emphasized that he would not have discharged Alexander if he had not made the reference to Castro.

An analysis of the Board's interpretation of Alexander's "Castro" remark clearly shows that it is without support in the record. Alexander was not discharged *after* or *for* making pro-union remarks at the meeting. He was told he was still an employee and should take his seat until Pride had finished his speech, at which time any questions would be answered. Thereafter Alexander was discharged immediately *when* and *because* he compared Pride to Castro. That Alexander's remark was made in a deliberate and defiant manner is shown by the complete absence of any prior conduct of the company or Pride which would in any way support Alexander's view that either of them had been acting in an arbitrary or totalitarian manner toward the employees. Pride had no difficulty in understanding that he was being likened to a Communist, and Alexander's fellow-employees, in describing Alexander's remark to Pride, remembered the remark as being "You are just like Castro." That Pride was "unwilling to hear both sides of the question" hardly deserves casting him as an "industrial dictator." Pride was not obliged to grant Alexander "equal time" for reply speeches on company time and property. In re Livingston Shirt Corporation, 107 N.L.R.B. 400; see N.L.R.B. v. United Steel Workers, 1958, 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed. 2d 1383. Finally, there is simply no support in the record for the inference drawn by the Board—contrary to the Trial Examiner—that Alexander was acting in a moment of emotional stress. Pride's talk was clearly protected by the free speech provisions of the Act and conceded so to be by the Board. There is not even a suggestion, much less proof, that Pride spoke in a challenging or irritating way, or made unfavorable personal remarks about the union leaders, Alexander, or other employees. On the other hand the Trial Examiner in reaching his conclusion that Alexander's "blunt disparagement of his employer came from some inner impulse of vindictiveness or malice *not warranted by anything shown in the record*" (emphasis supplied), noted that he had "also considered Alexander's manner of testifying and demeanor on the stand, which indicated that he was not a person of normal good humor or the outgoing type who would likely become emotional or make offhand remarks in a moment of anger, stress, or emotion, but a rather cold, deliberate, and unemotional individual."

While the inference to be drawn by the Board is not one based solely upon the demeanor of witnesses at the hearing before the Examiner, cf. N.L.R.B. v. Donnelly Garment Co., 1947, 330 U.S. 219, 229–231, 67 S.Ct. 756, 91 L.Ed. 854, and in this instance is not, strictly speaking, a credibility choice, we think the Examiner had a superior opportunity over the Board for evaluating whether Alexander's "Castro" remark was spontaneous and made under emotional stress in the course of hard union campaigning, or was made as a calculated flagrant act of insubordination. The recognition given to the credibility choice rule "that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion," Universal Camera Corp. v. N.L.R.B., 1950, 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456, is equally applicable to and compelling in the case *sub judice*. In an analogous situation we found the fact that the trial examiner had the opportunity to observe a witness on the stand to be of great significance in appraising whether a threat made by him to his employer was a spontaneous utterance under extreme provocation or was aggravated and gross misconduct rendering him unfit for further employment. N.L.R.B. v. R. C. Can Company, 5 Cir. 1965, 340 F.2d 433, 435–436.

"[T]he discharge of an employee for wrongful conduct is an inherent power of management and one that is protected by law. Shell Oil Co. v. N.L.R.B. (5 Cir. 1952) 196 F.2d 637. * * * so long as the action is not based upon opposition to union activities. N.L.R.B. v. McGahey, (5 Cir. 1956) 233 F.2d 406, * * * Paraphrasing our holding in Birmingham Publishing Co., [N.L.R.B. v. Birmingham Pub. Co.] (5 Cir. 1959) 262 F.2d 2, 9: 'If a man has given his employer just cause for his discharge, the Board cannot save him from the consequences by showing that he was pro-union and his employer anti-union. * * * If an employee is both inefficient [insubordinate] and engaged in union activities, that is a coincidence that does not destroy the just cause for his discharge.' " N.L.R.B. v. Soft Water Laundry, Inc., 5 Cir. 1965, 346 F.2d 930, 934.

▌ If, by hypothesis, the employee had been given the floor for the purpose of making a pro-union speech but had used the same language, it might be difficult to uphold his discharge, for the cases discussed herein show that some allowance must be made for intemperate language used during a heated union campaign. It might also be difficult to sustain a discharge were the hypothetical situation reversed so that the employee had interrupted his employer to make an unauthorized speech but had not resorted to intemperate langauge. In the instant case, however, both factors are present —Alexander violated the employer's legal ground rules and used intemperate language. His deliberate, vigorous defiance in the presence of other employees put the employer in an untenable position. With other employees seated around him, Pride was confronted with an employee who had twice disobeyed lawful instructions and on the second occasion had resorted to invective. His alternatives were to discharge the man immediately or take some less drastic course thereby risking the complete breakdown of plant discipline. We believe that the record shows that this particular combination of factors left him no reasonable alternative to firing Alexander and that there is no substantial evidence to support the inferences drawn by the Board which led to the finding that the company violated section 8(a) (1) of the Act by discharging him. The petition to set aside the Board's order should be and is granted and the Board's cross-petition to enforce its order is hereby denied.