**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PRESCOTT INDUSTRIAL PRODUCTS COMPANY, Respondent.**

No. 73–1777.

United States Court of Appeals,
Eighth Circuit.

Submitted May 13, 1974.

Decided July 16, 1974.

Joseph E. Mayer, Atty., N. L. R. B., Washington, D. C., for petitioner.

Walter B. Connolly, Jr., Asst. Counsel, Firestone Tire & Rubber Co., Akron, Ohio, for respondent.

Before JOHNSEN and VAN OOSTERHOUT, Senior Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

The National Labor Relations Board (the Board) seeks enforcement of its order [1] against Prescott Industrial Products Company (the Company) for violations of § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1970),[2] which it found the Company had committed by discharging L. H. Berry and by coercively interrogating Johnny Sorrells. The Company defended upon the ground that Berry was discharged solely for insubordination, and that Sorrells was never "interrogated," far less coercively so. The Board ordered the Company to cease and desist from the unfair labor practices found, to reinstate Berry and reimburse him for lost earnings, and to post the customary notices. The Company cross-petitions to vacate the orders of the Board. We enforce in part and deny enforcement in part.

*The Discharge of Luke Berry.*

It was the ruling of the Board that Berry's discharge was "in violation of Section 8(a)(1) of the Act for engaging in protected activity." [3] The Company argues to us, the Board contesting, that Berry's activities were not concerted but individual, that they were unprotected under the Board's own precedents,[4] and, moreover, that Berry's conduct, regardless of any other issue in the case, "was grossly insubordinate and his egregious conduct was the cause of his discharge." Since we regard the resolution of this latter issue as determinative of the case we will proceed directly to it.

The facts are relatively simple. We are dealing with an organizational drive by the Union [5] and the circumstances attendant thereon. The election was scheduled for June 15, 1972. The Company, opposing unionization, had held a number of meetings of its employees conducted by its plant manager, Thomas Krengel. On these occasions Krengel

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. Reported in 205 NLRB No. 15 (1973).

2. § 8(a)(1) makes it an unfair labor practice for an employer

   to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 7 [29 U.S.C. § 157 (1970)] of this title.

   § 7 guarantees employees, *inter alia,*

   the right to self-organization, to form, join, or assist labor organizations * * * and to engage in other concerted activities for the purpose of * * * mutual aid or protection * * *.

3. We read this language as the Board's characterization of the conduct which caused the discharge. We note the Board expressly declined to reach the issue of whether the discharge was a violation of § 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) (1970), an inquiry which normally focuses on whether the discharge was motivated by an antiunion purpose. American Ship Building Co. v. NLRB, 380 U.S. 300, 311, 85 S.Ct. 955, 13

L.Ed.2d 865 (1965); Mead & Mount Constr. Co. v. NLRB, 411 F.2d 1154 (8th Cir. 1969). *See* Shieber & Moore, Section 8(a)(3) of the National Labor Relations Act: A Rationale—Part II. Encouragement or Discouragement of Membership in any Labor Organization and the Significance of Employer Motive, 33 La.L.Rev. 1 (1972).

4. Citing Livingston Shirt Corp., 107 N.L.R.B. 400 (1953). The majority of the Board found no applicability of the case to the facts before it, although the dissenting members found it controlling. The literature on the issue is abundant, *see, e. g.,* Note, Labor Law—NLRB Regulation of Employer's Pre-Election Captive Audience Speeches, 65 Mich.L.Rev. 1236 (1967); Comment, Restrictions on the Employer's Right of Free Speech During Organizing Campaigns and Collective Bargaining, 63 Nw.U.L.Rev. 40 (1968); Pokempner, Employer Free Speech Under the National Labor Relations Act, 25 Md.L.Rev. 111 (1965), and cases and authorities cited therein.

5. United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO.

had permitted employees to ask questions. One such questioner had been employee Berry, who, the Administrative Law Judge found, "had raised issues that had disclosed his prounion stand."

On the day preceding the election, Krengel delivered what is conceded to be a lawful speech to a group of employees, pointing out the disadvantages of a union. This meeting was held upon Company premises and upon Company time. At or about the end of his prepared statement Krengel asked the employees whether or not the Union could give them a written guarantee of its promises, and stated that the Company could do so. He called upon the employees to step forward and receive their guarantees. As a few were so doing, Berry stood up and stated that he wanted to ask a question. "It requires no great powers of deduction," the Administrative Law Judge held, "to conclude that the question Berry proposed to ask or statement to make was responsive to the speech he had just been required to hear and Krengel admitted that he believed Berry to be a union advocate. * * * Berry was about to ask a question or make a statement favoring the union organization." Krengel stated that there would be no question and answer period [6] and requested, or ordered, Berry to sit down. Berry refused to do so. He remained standing, repeated that he wanted to ask a question, and asserted that he had a right to do so. He was

again refused and told to sit down. This procedure, Krengel's request that Berry sit and Berry's insistence that he be permitted to speak, was repeated several times; [7] Krengel's "request" finally developed into an order to leave the room. Berry was still standing in defiance of this order when a fellow employee took him by the arm and led him from the meeting; some twenty or twenty-five employees, over one third of the group, followed shortly thereafter.[8] It appears in the record, and we find no specific denials thereof, that Berry was loud and arrogant, pointing his finger at Krengel, at times "blatant" and incoherent, all of this taking place in full view of the assembled employees. He did not, however, direct personally abusive language toward Krengel. Berry's discharge for insubordination followed. His version of these events, we note, was not placed in the record by deposition [9] or otherwise.

A proper evaluation of the incident requires some perspective. It is clear, as the Supreme Court has held, that

The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for inter-

---

6. Witnesses differed as to whether the announcement was also made "in advance" or only when Berry attempted to speak. The Administrative Law Judge and the Board concluded the latter. We regard the moment of the announcement as irrelevant, so long as it was clear and clearly made, as to which no issue is presented to us.

7. The Company asserts there were six instances of Berry's refusal to obey Krengel; the Board's brief lists five. The Administrative Law Judge recounts four instances in his statement of facts, while the Board's decision mentions only three. All versions are supported by one witness or another who variously recalled from three to six commands by Krengel that Berry sit or leave.

8. The Board's brief argues that at this point "Berry walked out of the room with Stewart without further comment." The Appendix references here cited by the Board do not confirm the statement made. To the contrary, on the cited p. 46 we find: "But L. T. Stewart got up first and walked toward Luke [Berry] and turned to go out and said, 'If I have to leave, I think everybody that feels the way I do will go along with me.' So after he stood and Luke started out, I guess there was about twenty of us walked out, maybe more. I don't know. Approximately."

9. He was being held in the custody of the Arkansas Department of Correction at the time of the hearing.

ference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion.

NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45–46, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937).

We have held, in NLRB v. Red Top, Inc., 455 F.2d 721, 726 (8th Cir. 1972), quoting in part NLRB v. Ace Comb Co., 342 F.2d 841, 847 (8th Cir. 1965) that

"It must be remembered that it is not the purpose of the Act to give the Board any control whatsoever over an employer's policies, including his policies concerning tenure of employment, and that an employer may hire and fire at will for any reason whatever, or for no reason, so long as the motivation is not violative of the Act."

The Board's brief concedes that Berry's conduct "was 'mildly disruptive' and 'insubordinate'" but argues that it was not sufficiently flagrant to justify discharge, quoting Boaz Spinning Co. v. NLRB, 395 F.2d 512, 514 (5th Cir. 1968), that despite Berry's insubordination,

as a union activist making a pro-union speech, he can avail himself of the protective shield of section 7 so long as his insubordination was not so flagrant as to take him beyond the pale.

The Board's holding on the point was that:

Berry's conduct was not violent. There is no evidence it was engaged in for improper motives or in bad faith. Nor was Berry's activity of such a character as to render him unfit for further service. Berry's activity came after the speech while Employer was passing out "guarantees" and at most can be characterized as mildly disruptive. Moreover, although Berry protested that he should be permitted to ask the question he did not

attempt to do so in face of Krengel's instructions to the contrary.[10] Accordingly, we find that Berry's concerted activity was protected and therefore Respondent's discharge of Berry for that activity was unlawful. [Footnote ours.]

The Company also relies on *Boaz* which presents a close factual analogy to the case at bar.[11] A pro-union employee was discharged for insubordination arising out of an attempt to speak during a company "captive audience" meeting. The discharge was upheld by the court against charges, and a finding by the Board, of the company's violation of § 8(a)(1). The court, noting that "[the plant manager's] talk was clearly protected by the free speech provisions of the Act and conceded so to be by the Board," 395 F.2d at 515, held:

[The employee's] deliberate, vigorous defiance in the presence of other employees put the employer in an untenable position. With other employees seated around him [the plant manager] was confronted with an employee who had twice disobeyed lawful instructions and on the second occasion had resorted to invective.

395 F.2d at 516. The court also observed, quoting NLRB v. Soft Water Laundry, Inc., 346 F.2d 930, 934 (5th Cir. 1965):

" 'If an employee is both inefficient [insubordinate] and engaged in Union activities, that is a coincidence that does not destroy just grounds for his discharge.' " [Bracketed word in original]

*Id.*

The Board's brief seeks to distinguish *Boaz* on the ground that the employee's added invective was personally offensive to the Plant Manager, but such lack in the case before us does not impeach the

---

10. We note that the Board's brief states, to the contrary, that "Berry remained standing and repeated that he wished to ask a question." The conclusions of the dissenting Board members are in accord with the brief:

"Berry continued to defy Krengel who told him twice more to leave the room."

11. *See also* NLRB v. Leece-Neville Co., 396 F.2d 773 (5th Cir. 1968).

principles enunciated in the Court's refusal to enforce the Board's order.

■ The question before us, as was the case in *Boaz, supra,* 395 F.2d at 514, " 'is not the usual one of whether the Board's findings on disputed facts are supported by substantial evidence in the record as a whole, e. g., N.L.R.B. v. Brown, 1965, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839, but whether the inferences drawn by the Board * * * from the uncontroverted facts in this case are reasonable ones.' N.L.R.B. v. Suniland Furniture Co., 5 Cir. 1967, 387 F.2d 123 (Dec. 15, 1967)." Where, as here, an employee's pro-union activity is asserted to have interfered with management's right to maintain order and respect [12] and its right to deliver an anti-union speech,[13] the Board must engage in what we have described as a "balancing process." [14] The employees' rights are to be weighed against the interests of management in the pursuit of its lawful objectives. This balancing process, resting initially with the Board, is not immune from judicial review. As the court held in NLRB v. Thor Power Tool Company, 351 F.2d 584, 587 (7th Cir. 1965):

> The employee's right to engage in concerted activity may permit some leeway for impulsive behavior, which must be balanced against the employer's right to maintain order and respect. N.L.R.B. v. Illinois Tool Works, 153 F.2d 811 (7th Cir. 1946). Initially, the responsibility to draw the line between these conflicting rights rests with the Board, and its determination, *unless illogical or arbitrary*, ought not be disturbed. [Emphasis added.]

We recognize, of course, with the Board, that under the tensions and exacerbations experienced during an organizing campaign the statements of the parties may be both "bitter and extreme." [15] Similarly, during the processing of a grievance [16] or in the course of collective bargaining,[17] some leeway must be accorded employees where, as the Board puts it they "exceed the bounds of lawful conduct in a moment of animal exuberance." But before us we have no situation of mere exuberant conduct. The

12. § 10(c) of the Act, 29 U.S.C. § 160(c) (1970), provides in part:
No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause.

13. § 8(c) of the Act, 29 U.S.C. § 158(c) (1970) provides:
The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.
The legislative history of § 8(c), part of the Taft-Hartley amendments, makes it clear that its purpose was to effectuate employers' first amendment rights as a response, in part, to the restrictions placed by the Board on captive audience speeches:

> The Board has placed a limited construction upon [court cases holding that the Constitution guarantees freedom of speech on either side in labor controversies] by holding such speeches by employers to be coercive * * * if the speech was made in the plant on working time (Clark Brothers, 70 N.L.R.B. 60). The committee believes these [Board] decisions to be too restrictive * * *.

S.Rep.No.105, 80th Cong., 1st Sess. 23–4 (1947). *See generally* the authorities cited *supra* note 4.

14. McDonnell Douglas Corp. v. NLRB, 472 F.2d 539, 545 (8th Cir. 1973).

15. Linn v. Plant Guard Workers, Local 114, 383 U.S. 53, 58, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

16. NLRB v. Red Top, Inc., 455 F.2d 721 (8th Cir. 1972); NLRB v. Thor Power Tool Company, 351 F.2d 584 (7th Cir. 1965).

17. Bettcher Mfg. Corp., 76 NLRB 526 (1948).

record discloses that here, as in *Boaz, supra,* there was challenge and deliberate defiance, repeatedly asserted before the assembled employees, at a meeting lawfully convened for the presentation of the employer's position.[18] Moreover this captive audience speech was not a grievance or bargaining meeting where "employees must be placed in the status of equals in dealing with management."[19]

■ As in NLRB v. Red Top, Inc., *supra,* 455 F.2d at 728, we are of the opinion that

> The Board apparently is enunciating a general principle that insolvent, rough, and intimidating conduct cannot serve as a basis for discharge if that conduct is carried out in connection with the assertion of protected activity under § 7 of the Act and that unless such improper conduct, including threats, intimidations and acts adverse to the operation of the employer's business is "egregious," the same must be accepted as a normal and usual incident of labor-management relationships. ·

But a line must be drawn lest there be a complete disintegration of the relationships reasonably required, under any circumstances, between management and labor, to the detriment of both. The

Act, as we have noted, does not purport to give the Board any control whatever over the employer's policies concerning tenure of employment, and his measures of discipline and standards of conduct within his plant remain his own.[20]

■■ Upon the facts here presented it is both unreasonable and arbitrary to ascribe Berry's discharge to protected concerted activity under the Act. Where, as here, "the employer has proper cause for discharging an employee, the Board may not rely on scant evidence and repeated inferences to make a finding that places the Board in the position of substituting its own ideas of business management for those of the employer."[21] We are convinced that when the entire record is considered there was neither substantial evidence nor reasonable inference therefrom to support the Board's finding that Berry's discharge was the result of the exercise of his § 7 rights. Accordingly, the Board's order as it relates to the discharge of Berry will not be enforced.

#### The Interrogation of Sorrells.

■ The Board's ruling with respect to the interrogation of Johnny Sorrells stands in a different light. As noted,

---

18. The Company and the dissenting Board members argue that "[t]he employer, under the majority's view, could not limit or control the [employees'] participation in such a meeting," the result burdening "an employer's right to make a noncoercive speech." The Board's brief replies that

"[I]f at the conclusion of the employer's speech, the employees insisted upon speaking over the employer's objection, the employer could terminate the meeting and direct the employees to return to work. Thereafter, the employees' persistence in speaking would not simply be insubordinate, but would be an interference with the employer's right to insist that 'working time is for work.'

Under the view we take of the egregious nature of Berry's conduct we do not rule upon the Company's argument that an employee-imposed termination of the meeting violates the employer's right of free speech.

19. NLRB v. Red Top, Inc., 455 F.2d 721, 728 (8th Cir. 1972).

The Board found that Berry, in protesting that he had a right to ask the questions, was "present[ing] a grievance," thus converting a company meeting, convened and sanctioned under § 8(c) of the Act, into an immediate grievance hearing. We find no warrant in the record or in the precedents, upon these facts, for such holding, which the dissenting members of the Board characterized as "specious".

20. Here the Company had published "Rules of Conduct" with which Berry admitted his familiarity, which provide that "defying the authority of supervision" and "refusal * * * to follow the directions * * * of management" are infractions punishable by discharge.

21. NLRB v. Blue Bell, Inc., 219 F.2d 796, 798 (5th Cir. 1955).

the Company defended by denying that such interrogation ever occurred. We are presented with a question of credibility which the Administrative Law Judge resolved against the Company. He found that Sorrells' supervisor had asked him to report on who had attended previous union meetings, and, on another occasion, asked him to report back on who attended future meetings. We find substantial evidence on the record as a whole to support this finding. *See* NLRB v. Penzel Construction Co., 449 F.2d 148 (8th Cir. 1971).

The Company now argues, however, that even if such interrogation did occur, it was not a violation of § 8(a)(1) of the Act. It urges that the circumstances here reveal no background of union hostility as was presented in NLRB v. Speed Queen, 469 F.2d 189 (8th Cir. 1972) and in NLRB v. Louisiana Manufacturing Co., 374 F.2d 696 (8th Cir. 1967), cases where § 8(a)(1) violations were found. But the absence of this single factor does not preclude a finding of coercion.[22] We find no valid purpose in the Company's obtaining information concerning the union's strength, and we note that the supervisor gave Sorrells no assurances that reprisals would not be taken.[23] We believe, as we found in NLRB v. Louisiana Manufacturing Co., *supra*, 374 F.2d at 700–701, that such questioning is inherently suspect, especially where the employee is asked to report back the names of union adherents. Substantial evidence supports the Board's conclusions respecting Sorrells' interrogation.

The order of the Board as it relates to the discharge of Berry is denied enforcement. The order of the Board as it relates to the interrogation of Sorrells is enforced.

---

22. *See* NLRB v. Midwest Hanger Co. & Liberty Engineering Corp., 474 F.2d 1155, 1161 n. 5 (8th Cir. 1973).