———————————

No. 94-3843

———————————

Earle Industries, Inc.,          *
                                 *
          Petitioner,            *
                                 *
     v.                          *
                                 *
National Labor Relations Board,  *        On  Petition for Review of
                                 *        an Order of the National
          Respondent,            *        Labor Relations Board.
                                 *
Southwest Regional Joint Board,  *
Amalgamated Clothing and         *
Textile Workers Union, AFL-CIO,  *
CLC,                             *
                                 *
          Intervenor.            *

———————————

No. 95-1033

———————————

Earle Industries, Inc.,          *
                                 *
               Respondent,       *
                                 *
     v.                          *
                                 *
National Labor Relations Board,  *        On Petition for Enforcement
                                 *        of an Order of the National
               Petitioner,       *        Labor Relations Board.
                                 *
Southwest Regional Joint Board,  *
Amalgamated Clothing and         *
Textile Workers Union, AFL-CIO,  *
CLC,                             *
                                 *
          Intervenor.            *

———————————

Submitted:  June 14, 1995

Before WOLLMAN, FLOYD R. GIBSON and JOHN R. GIBSON, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Earle Industries, Inc. petitions for review of a National Labor Relations Board order finding that Earle Industries committed an unfair labor practice by firing Earley Mae Wallace.  The administrative law judge found that Earle Industries fired Wallace for insubordination and dishonesty.  However, the Board ordered Earle Industries to reinstate Wallace with backpay, despite the Board's adoption of the ALJ's credibility findings.  The Board cross-petitions for enforcement.  We grant the petition for review and deny enforcement of the order.

At the time she was fired, Wallace had worked for Earle Industries for sixteen years.  She had advocated unionization of the company's workers for many years.  The company had fired her twice, first in 1977 and then in 1978.  It reinstated her the first time in settlement of an unfair labor practice charge, and the second time as a result of a National Labor Relations Board Order. See Earle Indus. Inc., 260 N.L.R.B. 1128 (1982).

On October 1, 1991, in the midst of a union[1] organizing campaign at Earle Industries, the Reverend Jesse Jackson came to the plant to make a lunchtime speech in support of the union.[2]  A

_____

[1]The rally was held by the Amalgamated Clothing & Textile Workers' Union, Southwest Regional Joint Board, which intervened in this case.

[2]We recounted the story of the rally and subsequent events in greater detail in NLRB v. Earle Indus., Inc., 999 F.2d 1268 (8th Cir. 1993) (Earle I).  In Earle I, we upheld the Board's determination that any union misconduct did not materially affect election results.  Earle I did not involve Wallace's firing.

television news crew captured the speech and the ensuing events on videotape. The tape is in the record before us, and was the basis for much of the detail in the ALJ's findings.

Jackson delivered his speech from the back of a flatbed truck driven onto company property by a union representative. Local police arrived on the scene and informed the union organizers that they were trespassing on company property and asked them to leave. The organizers did not leave voluntarily, so police arrested two union representatives and put them in the back of a police car. Police also drove the flatbed truck off company property.

Jackson then learned that the two union men were under arrest and went to visit them at the police car, assuring them that he would get them released. The videotape followed Jackson as he walked toward the plant, surrounded by a crowd of admirers. Jackson and the crowd went to the employees' plant entrance. Above the door was a sign saying, "Employees Only."

After Jackson entered the plant, Wallace walked to the front of the entourage and led the way toward the office. The personnel manager, Gary Smith, stepped up to bar Jackson's way. Smith told Jackson he was trespassing and asked Jackson to leave the plant and return by the visitor's entrance in the front of the plant. As this conversation was taking place, Wallace urged Jackson to walk past Smith, saying "Front door locked, come on." Smith said to her, "No ma'am." Wallace repeated her statement, and said to Jackson, "Right over there," gesturing toward the office. Jackson calmly told Smith he would go back out to the visitor's entrance if Smith would go with him, which Smith refused to do. Jackson and Smith repeated this exchange several times. Unable to turn Jackson back, Smith gave up and retreated to the office, as the crowd cheered.

Jackson, surrounded by the crowd and news cameras, walked on

-3-

through the plant to vice president Peter Felsenthal's office. Jackson left the plant after speaking with police inside, but Felsenthal did agree to meet with Jackson. Jackson then entered the plant through the visitor's entrance.

Felsenthal obtained a copy of the videotape of Jackson's confrontation with Smith from the television station that recorded it. After viewing the tape and seeing Wallace's prominent role in the Smith-Jackson confrontation, Felsenthal decided to call Wallace in for questioning. On October 7, Felsenthal interviewed Wallace, with Smith and supervisor Louise Eskridge present. Unbeknownst to Wallace, Felsenthal audiotaped the meeting. Wallace at first refused to answer questions and demanded an attorney. Felsenthal offered to let Wallace have a fellow worker with her in the interview, but Wallace still repeatedly declined to answer his questions. After Wallace said there was no point in questioning her, since Felsenthal had seen the tape of the incident, Felsenthal said: "I saw what was on T.V. and that was it. I don't know what went on." In fact, Felsenthal had already seen the uncut news station video, as well as the excerpts that appeared on the news. The interview continued until Wallace finally began making statements. Wallace eventually told Felsenthal that she "did not indicate to anybody that the front door was locked" and did not "motion or encourage" Jackson in his progress through the plant.

Earle Industries first suspended, then fired Wallace, citing her conduct on October 1 and her failure to cooperate with the company investigation on October 7.

The Union filed an unfair labor practice charge against Earle Industries, alleging that, in firing Wallace, the company violated sections 8(a)(1) and (3) of the National Labor Relations Act.[3]

---

[3]Sections 8(a)(1) and (3), codified at 29 U.S.C. § 158 (1988), provide:

Wallace filed an affidavit in which she described the October 1 incident. In the affidavit Wallace said that when Smith stopped Jackson she had said, "[L]et's clock," and motioned to the other workers to go to the time clock. She explained:

> During the time that Jackson was in the plant talking to Smith, I didn't have anything to do with what Smith and Jackson were talking about--I was telling the girls to "come on" to the clock--and I was motioning them to come--kind of whispering "don't forget to clock" at the same time--they were talking. I can't remember saying anything about a door being locked while Jackson was coming down through the aisle in the plant. . . . I don't have anything to do with the front door at all--the front door is usually locked. . . . I was saying "clock" not "lock."

After a hearing the administrative law judge recommended that the Union's complaint be dismissed. The ALJ held that Wallace forfeited the protection of the NLRA by her conduct. Specifically, the ALJ found that Wallace intentionally lied during Smith's confrontation with Jackson:

> While it might be argued that the first time Wallace made this statement ["front door locked"] it was spontaneous, I do not believe that to be the case. There is no evidence of record that the front door was locked. It is normally left unlocked at this time of day. And there is evidence that it was not locked on October 1. When Wallace said that it was locked the first time it was a misstatement. . . . Wallace was a totally unreliable

---

(a) It shall be an unfair labor practice for an employer--

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .

witness. She lied before in a Board proceeding. She lied in her affidavit to the Board in this proceeding. And she lied while testifying herein. Wallace wanted Jackson to continue walking through the plant notwithstanding the fact that it would have been obvious to a reasonable person that Gary Smith, Respondent's personnel manager, by what he said and by his body language, wanted Jackson to go back out the employee entrance. . . . Jackson, relying on what Wallace was saying, apparently believed he would be locked out of the plant if they locked the employee entrance behind him. . . . But for Wallace's statements, I believe that Jackson would have gone, as he subsequently did, to the front door. Wallace's first statement that the front door was locked was not a spontaneous or impulsive statement. Wallace impressed me as being a very calculating individual. This was a calculated statement. As she subsequently demonstrated, no matter what Smith said or did Wallace wanted Jackson to proceed through the plant and this was her way of achieving that.

Earle Indus., Inc., 315 N.L.R.B. 310, 347-48 (1994). The ALJ made specific findings that Earle Industries fired Wallace because of her insubordination and dishonesty, rather than because of her union activity:

> Was Wallace terminated because she was insubordinate and she lied about it or was she terminated because of her union activity? In my opinion it is the former. . . . I believe that Respondent has shown that it would have terminated Wallace absent her union activity and any concerted protected activity she may have engaged in.

Id. at 348-49.

Despite the ALJ's recommendation, the Board found Earle Industries had committed an unfair labor practice, issued a cease and desist order, and ordered Earle Industries to reinstate Wallace with backpay. Id. at 315-16.

Significantly, the Board adopted the ALJ's credibility determinations. Id. at 310 n.1. The Board did not disagree with the ALJ that Wallace was insubordinate and dishonest. Id. at 312

-6-

n.11, 313-35.  Rather, the Board used a different legal analysis than the ALJ.  The ALJ held that Wallace had forfeited the protection of section 7 of the NLRA[4] by her insubordination and dishonesty.  Id. at 348.  The ALJ then used the Wright Line[5] test for mixed motive firings.  Id. at 349.  Under Wright Line, if an employer is accused of firing an employee because of the employee's union activities, the General Counsel must show that the employer was motivated by anti-union animus.  The burden is then on the employer, which can exonerate itself by showing that it would have fired the employee for a legitimate, nondiscriminatory reason regardless of the employee's protected activity.  See generally 1 ABA Section of Labor and Employment Law, The Developing Labor Law 195 (Patrick Hardin et al. eds. 3d ed. 1992).  The ALJ found that the General Counsel had not showed Earle Industries acted out of anti-union animus.  Earle Indus., 315 N.L.R.B. at 349.  Further, he found that Earle Industries showed it would have fired Wallace for insubordination and dishonesty regardless of her union activity. Id.

The Board, on the other hand, considered the Wright Line test inapplicable to this case because the misconduct for which Earle

---

[4]Section 7 of the NLRA, codified at 29 U.S.C. § 157 (1988), provides:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

[5]251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982), approved in NLRB v. Transportation Management Corp., 462 U.S. 393 (1983).

Industries fired Wallace occurred in the context of concerted activities. Id. at 315 n.19. In such a case even conduct like dishonesty and insubordination, which could justify firing under the Wright Line test, can fall into a class of protected misbehavior or "leeway," which the Board considers a necessary accommodation of the realities of industrial life. Id. at 313-14; see F. W. Woolworth Co., 251 N.L.R.B. 1111 (1980), enforced, 655 F.2d 151 (8th Cir. 1981), cert. denied, 455 U.S. 989 (1982); Consumers Power Co., 282 N.L.R.B. 130 (1986). The Board held that Wallace's insubordination fell "within the degree of latitude which the Act affords employees in order to ensure that they may freely exercise their Section 7 rights." Earle Indus., 315 N.L.R.B. at 313. The Board found that Wallace's lies in the various steps of this proceeding were precipitated by the company asking her questions it should not have asked: "Wallace may well have felt compelled to conform her testimony in this proceeding to the statements which she made during the course of the coercive interrogation. . . ." Id. at 315. Accordingly, the Board held that in firing Wallace, Earle Industries violated sections 8(a)(1) and (3) of the NLRA (29 U.S.C. § 158(a)(1) & (3)). Id. at 313. The Board ordered Wallace reinstated with backpay. Id. at 315.

On petition for review, Earle Industries argues that it was entitled to fire Wallace for insubordination and dishonesty.

We review the Board's findings under the substantial evidence standard, meaning that we will not disturb the findings if they are supported by substantial evidence on the record as a whole, taking into account the evidence detracting from the findings. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). We examine the Board's findings more critically when, as here, the Board's conclusions are contrary to the ALJ's, because the ALJ's opinion is part of the record we must consider. GSX Corp. v. NLRB, 918 F.2d 1351, 1356 (8th Cir. 1990); NLRB v. Hawkins Constr. Co., 857 F.2d 1224, 1226 (8th Cir. 1988); see Universal Camera Corp., 340 U.S. at

-8-

496.

Earle Industries argues that it was entitled to fire Wallace in order to maintain discipline at its plant. It argues that Wallace was part of a group of employees who assisted and accompanied Jackson in making his way through a part of the plant where he had no right to be.[6] When the personnel manager stopped Jackson, Wallace defied the manager before a crowd of employees and did so by means of a false statement. The ALJ found the false statement to be calculated, not impulsive, Earle Indus., 315 N.L.R.B. at 348, and the Board adopted the ALJ's credibility findings, id. at 310 n.1.

The Board argues that if an employee's misconduct occurs simultaneously with any sort of concerted activity, the employer must tolerate the conduct unless it is "flagrant" and "opprobrious", and cites instances of equally bad behavior that the Board has protected in the past.[7]

---

[6]The Board compares the Jackson incident to past incidents in which other employees' family members entered the plant by the employees' door. Earle Indus., 315 N.L.R.B. at 314. The Board argues that the company did not care about the rule, but used the rule as a pretext for firing Wallace. The videotape of the Jackson visit shows a horde of people, including news cameras, other press, and employees, walking en masse through the plant. This crowd scene is hardly analogous to a visit by a solitary husband or even a family group come to say good byes. See id. at 340. Therefore, we reject the Board's contention that these past incidents show Earle Industries' concern about use of the employee entrance during the Jackson incident was pretextual.

[7]The Board also cites several cases in which United States courts of appeals enforced Board orders: Keokuk Gas Service Co. v. NLRB, 580 F.2d 328, 335 n.17 (8th Cir. 1978); Hawaiian Hauling Serv., Ltd. v. NLRB, 545 F.2d 674, 675-76 & n.8 (9th Cir. 1976), cert. denied, 431 U.S. 965 (1977); Crown Cent. Petroleum Corp. v. NLRB, 430 F.2d 724, 730-31 (5th Cir. 1970); J. P. Stevens & Co. v. NLRB, 547 F.2d 792, 793-94 (4th Cir. 1976); and Coors Container Co. v. NLRB, 628 F.2d 1283, 1288 (10th Cir. 1980).

The first four cases involved grievance proceedings, captive

-9-

It is true that the Board has the power and the responsibility to balance the employee's section 7 interest against the employer's interest in maintaining discipline.  See NLRB v. Prescott Indus. Prods. Co., 500 F.2d 6, 10 (8th Cir. 1974); NLRB v. Thor Power Tool Co., 351 F.2d 584, 587 (7th Cir. 1965).  Though the Board's decision is discretionary, it is not beyond review.  Prescott Indus., 500 F.2d at 10.  We must deny enforcement if the Board's determination is illogical or arbitrary.  Id.  And, more to the point, that balancing test must be anchored in the policies of the National Labor Relations Act.  We have refused to enforce Board orders based on the unreasonable and arbitrary conclusion that the employee's misconduct should be protected under section 7.  See Prescott Indus., 500 F.2d at 10-11; NLRB v. Red Top, Inc., 455 F.2d, 721, 726 (8th Cir. 1972); accord Sullair P.T.O., Inc. v. NLRB, 641 F.2d 500, 503 (7th Cir. 1981).

The Board seeks to exercise its discretion by cutting a wide swath for permissible misconduct occurring in connection with any sort of concerted activity.  The Board distinguishes only between gradations of offensiveness of the conduct.  The Board's conception of "leeway" for misconduct is far too blunt an instrument when applied without regard to the situation in which the misconduct took place.  In past cases we have held the Board must take into account other factors in considering whether protecting such conduct serves the NLRA's goals of self-organization and representation.  See Red Top, 455 F.2d at 725-26 (quoting NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45-46 (1937)).  We held the conduct of the employees in Red Top to be unprotected because protecting the conduct did not serve the purposes of the Act:  "We do not think the approval of conduct disclosed by this record will encourage harmonious labor-management relationships nor result in

---

audience speeches, or strikes, all of which we discuss infra at 11-12.  J. P. Stevens and Coors also involved conduct specifically found to be impulsive, unlike Wallace's conduct in this case.  See infra at 12.

-10-

the proper consideration and resolution of legitimate grievances. Quite to the contrary, it would encourage insolence, insubordination, and intimidation."  Id. at 728.

In view of the purposes of the NLRA, we have recognized that an employer cannot insist on subordination in the context of bargaining or grievance processes.  These are situations in which the Act aims for equality of bargaining positions between employer and employee to permit meaningful negotiation.  See Red Top, 455 F.2d at 728; Prescott Indus., 500 F.2d at 11; see also Chemvet Labs., Inc. v. NLRB, 497 F.2d 445, 452 (8th Cir. 1974); see generally NLRB v. City Disposal Sys., Inc., 465 U.S. 822, 835 (1984) ("[I]t is evident that, in enacting § 7 of the NLRA, Congress sought generally to equalize the bargaining power of the employee with that of his employer by allowing employees to band together in confronting an employer regarding the terms and conditions of their employment.").  In Crown Central Petroleum Corp. v. NLRB, 430 F.2d 724 (5th Cir. 1970), which the Board cites, the Fifth Circuit focussed on the context of the misconduct as the key to deciding whether the misconduct was protected by the Act. There, the misconduct was protected because it occurred during grievance proceedings:

> Of central importance to our view of the case, is the nature of the protected activity involved.  Harris and Gilliam were participating in a grievance meeting, which by its very nature requires a free and frank exchange of views, and where bruised sensibilities may be the price exacted for industrial peace.  As the Board noted, a grievance proceeding is not an audience, conditionally granted by a master to his servants, but a meeting of equals--advocates of their respective positions.  Manly was not assailed with abuse on the floor of the plant where he stood as a symbol of the Company's authority; the characterization of the untruth came while he was appearing as a Company advocate during a closed meeting with Union representatives.

430 F.2d at 731 (emphasis added).  Therefore, we have required

employers to countenance insubordinate, rude conduct in these contexts that might be cause for firing without the protection of the NLRA.

Similarly, in the context of strikes, grievances, and captive audience speeches, we have recognized that industrial conflict tends to bring out less than admirable conduct. We have acknowledged the need to excuse impulsive, exuberant behavior (so long as not flagrant or rendering the employee unfit for employment) as an inevitable concomitant of struggle. See Prescott Indus., 500 F.2d at 10; Red Top, 455 F.2d at 728 ("It is of course understandable that tempers may flare in the course of grievance meetings and that harsh and rough words may be exchanged between the parties without giving rise to a basis for discharge consistent with the protections afforded under § 7 of the Act."). Conversely, we have considered an employee's bad faith or calculated use of the shelter of the Act in holding that section 7 did not extend its protection to that employee's acts.[8] See Red Top, 455 F.2d at 726 ("[t]he question of whether or not the three employees pressed their alleged grievances in good faith becomes vitally important."); Prescott Indus., 500 F.2d at 10 ("[B]efore us we have no situation of mere exuberant conduct."); cf. F. W. Woolworth Co. v. NLRB, 655 F.2d 151, 154 (8th Cir. 1981) (excusing employee's conduct as impulsive), cert. denied, 455 U.S. 989 (1982).

---

[8]We believe that this concern about bad faith remains vital after ABF Freight Sys., Inc. v. NLRB, 114 S. Ct. 835 (1994). ABF holds that the Board may reinstate an employee who was wrongfully discharged, but who lied to the employer and in Board proceedings. In ABF the Supreme Court emphasized that though the worker had lied, ABF fired him because of union activity and not because of his dishonesty. 114 S. Ct. at 838. Therefore, the question before the Court was whether the employee's abuse of Board proceedings prevented the Board from reinstating him even though the employer had committed an unfair labor practice. Wallace's case and those we rely on here deal with the entirely different question of when it is an unfair labor practice to fire a worker for dishonesty and insubordination occurring in the context of concerted activity.

We have also weighed the effect of the employee's conduct on the employer's authority in the workplace. Compare Prescott Indus., 500 F.2d at 8-11 (permitting firing where walkout undermined employer's authority) with F. W. Woolworth, 655 F.2d at 154 (not permitting firing where employee's conduct posed no threat to employer's authority).

We also take into account whether the employer unlawfully provoked the employee's misconduct. See NLRB v. Vought Corp., 788 F.2d 1378, 1384 (8th Cir. 1986); Wilson Trophy Co. v. NLRB, 989 F.2d 1502, 1509 (8th Cir. 1993). The ALJ specifically found that Earle Industries did not provoke Wallace's defiant conduct during the Jackson incident, Earle Indus., 315 N.L.R.B. at 348, a conclusion the Board did not take issue with.

Here, the factors of context, impulsiveness and effect on discipline all weigh against Wallace. Although the incident occurred in the context of a union campaign, we cannot ignore the fact that the nonemployee union organizers had basically moved their rally onto the plant floor. When Smith tried to assert the company's rights,[9] Wallace defied him. If Wallace had not been part of a group escorting Jackson through the employees' entrance,[10] she would never have become involved in the standoff between Jackson and Smith; the concerted activity underlying her misconduct consisted of breaking a legitimate company rule with others. If we hold that the concerted activity gave her the license to defy her employer, we allow her to leverage her rights by wrongful conduct. Thus, her case is fundamentally different from grievance or

_____

[9]See generally Lechmere, Inc. v. NLRB, 502 U.S. 527, 537 (1992).

[10]The Board makes some issue about whether Wallace led Jackson in the door. Earle Indus., 315 N.L.R.B. at 314 n.14. We need not resolve that issue, since it is indisputable from the videotape that Wallace was part of a large band of employees escorting Jackson through the plant.

bargaining cases where the employee misbehaved in conducting union business that he had every right to pursue. Further, even if she had not been breaking a company rule to begin with, Wallace defied the personnel manager, not in the protected give and take of negotiations or grievance, but "on the floor of the plant where he stood as a symbol of the Company's authority." Crown Cent., 430 F.2d at 731. This context differs crucially from grievance and bargaining settings where the NLRA frees the worker from subordination the employer otherwise has the right to insist on.

Second, the ALJ found that Wallace deliberately lied to Jackson to cause him to push forward instead of going back to the visitor's entrance as Smith asked him to. The ALJ concluded the misconduct was "calculated," not impulsive. Therefore, Wallace's case differs from the cases where we excused impulsive or exuberant conduct. Protecting her action would create a license for manipulative dishonesty, surely not a goal of the Act. See Red Top, 455 F.2d at 728.

Finally, Smith was humiliated in front of a crowd of workers and news cameras, undermining his authority in the plant. The crowd cheered as Smith gave up on trying to turn Jackson back to the visitor's entrance and as Jackson and his entourage surged toward the office. The Board's decision simply does not consider the employer's interest in maintaining discipline.

By holding that Wallace's initial misbehavior in escorting Jackson through the plant gave her a zone of safety for insubordination on the plant floor, and that her insubordination gave her a license for her later dishonesty in the interview, the Board does not serve the purposes of the Act, but gives the Board's imprimatur to industrial anarchy. We therefore hold the Board's misguided application of its balancing test to be unreasonable and arbitrary.

There is not substantial evidence on the record as a whole of an unfair labor practice.  See Prescott Indus., 500 F.2d at 11.

We grant the petition for review and deny enforcement of the order.

WOLLMAN, Circuit Judge, dissenting.

The court's opinion sets forth a most thorough review of our decisions in cases of this nature, but it seems to me that the opinion leads to the conclusion that the Board's decision must be upheld.

In describing the events that occurred at Respondent's plant on October 1, 1991, we pointed out that less than two minutes elapsed from the time Reverend Jackson entered the plant to the time he entered the front office; that the activities within and without the plant were restrained in nature; that neither Reverend Jackson nor any union agents made any threats of any kind against Respondent's management, employees or property; that Reverend Jackson's exchange with Gary Smith was quiet and civil; that the employees had not, contrary to Respondent's assertions; erupted into a frenzy or near-riot.  N.L.R.B. v. Earle Industries, Inc., 999 F.2d 1268, 1270, 1273 (8th Cir. 1993).  Granted, the issue in that appeal was whether the events of that day interfered with the representation election held later that month, but our holding that they did not supports the Board's holding that Ms. Wallace's October 1, 1991, conduct fell within the zone of activities protected by Section 7 of the National Labor Relations Act.

Given Reverend Jackson's short stay within the employees' area of the plant, the restrained nature of his exchange with Gary Smith, and his subsequent entry through the visitors' entrance, I agree with the Board that Ms. Wallace's conduct in encouraging Reverend Jackson to enter and proceed through the employees'

-15-

entrance was neither flagrant nor extreme and did not differ in any material way from the encouragement offered to Reverend Jackson by other employees, none of whom was later disciplined by Respondent.

Likewise, although I join with the court in decrying dishonesty and false statements by employees, I cannot say that the Board abused its discretion in holding that Ms. Wallace's false answers during the October 7 interrogation did not forfeit her right to the protections afforded her by the Act. If false testimony under oath before an administrative law judge does not preclude reinstatement, see ABF Freight System, Inc. v. N.L.R.B., 114 S. Ct. 835 (1994), neither do the false statements made by Ms. Wallace in what the Board found was a coercive interrogation and then only after she had initially exercised her right not to answer any questions regarding her activities on October 1, 1991. Had I been the administrative law judge in this case, I might well have ruled as Judge West did, for I am no more tolerant of false statements than are my colleagues. Employers are entitled to honest employees, but where the false statements are made in the course of protected union activity, it is within the Board's discretion to fashion a remedy for a violation of that protected activity that in effect does not penalize, and perhaps will be viewed by some as rewarding, such statements.

I would deny the petition for review and would enforce the Board's order of reinstatement.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-16-