**CHEMVET LABORATORIES, INC.,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

No. 73–1372.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 14, 1973.

Decided May 8, 1974.

446

Lyle McClain, Kansas City, Mo., for petitioner.

Martin Namrow, Asst. Gen. Counsel, NLRB, Washington, D. C., for respondent.

Before GIBSON, MOORE* and WEBSTER, Circuit Judges.

* LEONARD P. MOORE, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.

MOORE, Circuit Judge.

This is a petition for review and a cross-application for enforcement of an order of the National Labor Relations Board issued on February 8, 1973 and supplemented on June 14, 1973.

Because of the supplemental decision and order of the Board dated June 14, 1973, the petition for review filed June 7, 1973, the first amended petition for review filed July 10, 1973, the cross-application for enforcement dated July 16, 1973, the amended cross-application for enforcement filed July 27, 1973, and the answer to the amended cross-application filed August 10, 1973, particular attention must be given to the decretal portions of the Administrative Law Judge's decision, the Board's decision and supplemental decision.

Specifically, the Administrative Law Judge in substance ordered Chemvet to desist from (a) discouraging membership in Department Store, Package, Grocery, Paper House, Liquor and Meat Drivers, Helpers and Warehousemen Local Union 955 (the "Union"); (b) threatening plant closure to discourage Union support; (c) interfering with the employees' rights to self-organization; and by way of affirmative action (a) to offer employee Connie Sue Ellis full reinstatement to her job with make-whole pay; and (b) to make whole employees Ruhl, Terrell, Downey and Ellis for loss of pay due to overtime work discrimination.

The Board's order filed February 8, 1973, affirmed the Administrative Law Judge's decision except that it modified it as to "overtime" in an important respect as follows:

> While we find, in agreement with the Administrative Law Judge, that the evidence is sufficient to show a decline in available overtime offered to these employees and to establish a causal relationship between this and the employees' union activities, we find no practicable way to measure how much overtime would have been available or which employees would

have availed themselves of overtime opportunities, had they been offered. Employee Ruhl, for example, had made clear at the outset of the events with which we are here concerned that he was not going to be willing to perform as much overtime as he had in the past. Employee Terrell's testimony leaves us in some doubt as to how much additional overtime he would have accepted. There is also evidence that new equipment lessened somewhat the need for overtime. These and other factors suggest that an affirmative make-whole order would lead only to an evidentiary morass in our compliance proceedings. We will therefore substitute for the affirmative make-whole order recommended by the Administrative Law Judge a specific injunctive prohibition against future discrimination in offering overtime opportunities to employees.

The Board then some four months later amended its decision by reinstating the Administrative Law Judge's decision as to overtime back pay.

After considering the entire record, the decisions of the Administrative Law Judge and the Board, and the Board's supplemental decision, we enforce the Board's original decision of February 8, 1973, as supplemented by its decision of June 14, 1973, except as to reinstatement of Connie Sue Ellis and back pay for her.

Chemvet Laboratories, Inc. (Chemvet) is a company, located in Kansas City, Missouri, engaged in the manufacture and distribution of veterinary pharmaceuticals. Nick Yovetich and Michael Harmon are the principal shareholders of the corporation. At the time in question nine persons were employed at the two-story plant occupied by Chemvet: three were engaged in the production of liquid pharmaceuticals on the second floor of the Chemvet plant; two others produced powders, tablets and boluses on the first floor; and three others who also worked on the first floor were primarily engaged in the packaging, labelling and bottle washing operations.

Organizational activity began on March 15, 1972, when Kenneth Ruhl, one of the first floor employees, contacted the Union and inquired whether it would be willing to represent the Chemvet employees. Ruhl discussed the possibility of union representation with the remaining first floor employees (with the exception of Charline Rodriguez) and, the next day, this group of five union adherents agreed that their best interests would be served by unionization. The following evening this group went to the union hall and signed union authorization cards. On Monday, March 20, the Union wrote the company claiming majority status and also filed a petition with the Board for a representation election. The next day the company received a notice from the Board that the petition had been filed, along with a Board notice to employees setting forth their rights under the Act. Thereafter, unionization became the topic of numerous discussions within the plant.

At the hearing before the Administrative Law Judge, several employees testified that a few days after the posting of the NLRB notice Mike Harmon entered the main first-floor workroom and shouted to the employees working there that "he was the boss and if he had to, he would shut it [the plant] down." Harmon then walked into the bolus room, also on the first floor and, according to the testimony adduced at trial, confronted Ruhl, saying, "Ken, I want you to understand that I'm the boss and I always will be." After a further exchange, Harmon reputedly declared that "if he had to he would close the place down."

On March 29, shortly before the regular 4 p. m. quitting time, Rodriguez and Ellis, two employees responsible for product packaging and labelling ceased production and started to clean the labelling machine. Nick Yovetich told the pair that it was not yet time to quit for the day and he ordered them to return to work. Rodriguez returned to work but Connie Sue Ellis did not. As Yovetich was leaving the room, Ellis, in making a statement to Rodriguez, loudly referred to Yovetich as a "son-of-a-bitch." A minute later Yovetich returned and, when Ellis refused to return to work, he discharged her.

Minutes after the incident between Yovetich and Ellis, Harmon demanded that employees Ruhl and Terrell, union supporters, surrender the keys to the plant which had long been entrusted to them in order to facilitate entrance to and exit from the plant when they worked overtime. Harmon also demanded keys from employees Dodig and Balew, two upstairs employees and nonsupporters of the Union. However, after the lock to the plant was changed, new keys were given to these two employees. No similar offer was made to either Ruhl or Terrell.

During this general period, i. e., between March and April, 1972, employees in the powder, tablet and bolus production department, all of whom were union adherents, suffered a reduction in the amount of overtime work they normally performed.

### Plant Closure

A threat to close the plant, when made in the context of the union organization of the employees, has long been recognized as one of the most potent instruments of employer interference with the right of employees to organize under the National Labor Relations Act. See N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 618–620, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Appellant does not take issue with this recognized principle, rather it claims that the evidence presented to the Administrative Law Judge was insufficient to support the conclusion that management had threatened the employees with plant closure or had in any way interfered with their Section 7 rights.

Harmon conceded that he had announced to the various first floor employees (almost all of whom supported union representation) that "he was the boss"; however, he denied remarking to anyone that he was considering the pos-

sibility of closing the plant. Furthermore, appellant claims that the "dominant theme" of Harmon's exclamations was an assertion of authority, rather than any opposition to the organizational movement.

There is a threshold question of witness credibility. The recollections of the employee witnesses contrast sharply with Harmon's testimony. However, "[i]t is settled law * * * that the question of credibility of witnesses is primarily one for determination by the trier of facts, and findings in this area are reversed only in extraordinary circumstances." N.L.R.B. v. Panzel Construction Co., 449 F.2d 148, 149 (8th Cir. 1971). This principle is simply a corollary of the general rule found in Section 10(e) of the Act which provides that: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record as a whole shall be conclusive." 29 U.S.C. § 160(e) (1970). Because the employee testimony constitutes substantial evidence to support the Board's finding that Harmon threatened to close the plant, we accept that finding.

A threat to close the plant is a violation of Section 8(a)(1) if it is "reasonably likely to restrain" employees in the exercise of their statutory rights. McGraw-Edison Co. v. N.L.R.B., 419 F. 2d 67, 71 (8th Cir. 1969). Here, the threats to close the plant were made only a few days after the company learned of the union organization and while unionization was a principal daily topic of conversation among the employees. One of the threats was addressed to employee Ruhl who had led the drive for union representation. Substantial evidence supports the Board's conclusion that the threat constituted a violation.

### The Plant Keys

Appellant also contends that the conclusion that the plant keys were taken from employees Ruhl and Terrell for purposes of intimidation and other anti-

union consideration is not supported by any substantial evidence. In fact, argues appellant, the primary reason Harmon took the keys of these two employees is because he had just been informed of a recent non-forcible entry made into the plant without management permission. Moreover, appellant points out that the withdrawal of the keys could not have been a prelude to any more substantial anti-union activities, including the possible reduction of overtime, because the keys were not really necessary to any functions, either regular or overtime, performed by the employees.

The crucial fact here is that although keys were taken from all four employees who possessed them, a new lock was installed and new keys were distributed to the two employees who had not shown any pro-union sentiment. Harmon claimed that the discrimination was justified because, while he was unsure of Terrell and Ruhl, he was convinced that the two other employees to whom he gave new keys were trustworthy. However, when he was pressed for his reasons, he could only respond in the most vague and cryptic manner.

The fact that the keys were unnecessary to the functions performed by Ruhl and Terrell is immaterial. The withdrawal could have been intended as a symbolic act by the company: one that was meant to show the union supporters that there could be no friendship or trust between them and management. At least some of the employees interpreted the company's action as an attempt at retaliation for their organizational activity and as a harbinger of similar future measures.

The critical question is the company's motive, and motive is "a question of fact to be determined by the Board from consideration of all the evidence." N.L.R. B. v. Murray Ohio Manufacturing Co., 358 F.2d 948, 950 (6th Cir. 1966). Substantial evidence on the record as a whole supports the Board's findings that the company violated Section 8(a)(1) of

the Act by the withdrawal of the union adherents' plant keys.

### Overtime

The complaint against Chemvet charged that it had been guilty of discrimination in the allotment of overtime to employees Downey, Ellis, Ruhl and Terrell because of their organizational activity. The company readily admits that these four employees suffered a reduction in overtime,[1] but it denies that the reduction was in any way related to the impending representation election. The company attributes the reduction to three independent factors: the desire of many of the union adherents to reduce their own overtime work, the breakdown, during March and April, 1972, of machinery used in bolus and powder production, and the installation of new machinery in that department at the end of April which obviated the need for the substantial amounts of overtime previously required. According to the company, the fact that nonsupporters of the Union received no similar reduction (and in some instances actually had their overtime assignments increased) was strictly coincidental and could be attributed to factors unrelated to organizational activity.

The Administrative Law Judge rejected each of the explanations offered by the company to explain the reduction in overtime. He observed that the testimony showed that contrary to the assertions made by management, most of those employees who had suffered decreased overtime had requested it and had been turned down by the company, even though permission to work overtime had hitherto been implicit. Indeed, after the company received the General Counsel's amended complaint on May 18, 1972, overtime assignments rose sharply, rebutting the argument that the reduction might have been due to employee reluctance.

The Administrative Law Judge did not accept as a reason that the reduction was attributable to mechanical breakdown. While Yovetich testified that there was "a great deal more breakdown" in "March and April than any other period in the history of the company," the company produced invoices only for March 1972. Yovetich stated that these were all the bills for machine repairs during the March-April period. Two of these six invoices covered repairs made before the inception of the union activity (and during the week of those mechanical malfunctions the five union supporters nevertheless worked a total of 72 hours' overtime). Two of the remaining four bills involved two machines which Yovetich testified were only "down one full day and returned the next day." Further, he conceded that at that time, "there was still overtime available," and that, after the breakdowns, overtime would be required "[a] as a general rule" to catch up on production.

Finally, the argument that the introduction of the new machinery into bolus and powder production was likewise rejected as an explanation for the reduction in overtime. The reduction commenced with the inception of organizational activity on or around the week of March 20, 1972. The new machines were not operative until April 24 or 25,

1. *Overtime Assignments* (hours per week)

| Employee | | Before Union Activity | After | Employee | | Before Union Activity | After |
|---|---|---|---|---|---|---|---|
| Ruhl | (pro-union) | 22.75 | 2.78 | Ballew | (non-union) | 19.23 | 20.76 |
| Terrell | (pro-union) | 9.88 | 1.76 | Dodig | (non-union) | 2.23 | 2.01 |
| Downey | (pro-union) | 7.96 | .89 | Leslie | (non-union) | 13.07 | 9.91 |
| Ellis | (pro-union) | 5.79 | * | Rodriguez | (non-union) | 1.00 | 4.84 |
| Bordon | (pro-union) | 1.00 | 1.00 | | | | |

* Ellis, who was discharged on March 29, 1972, received no overtime after March 17.

after overtime had already been reduced for a month and a half. Whether the earlier reduction and the reduction which occurred after the installation were the result of a determined discriminatory policy must await further factual development.

Once again the focal issue is the question of motive.

Illegal motive has been held supported by a combination of factors, such as " * * * general bias or hostility toward the union," N.L.R.B. v. Superior Sales, Inc., 366 F.2d 229, 233 (8th Cir. 1966); variance from the employer's "normal employment routine," N.L.R.B. v. Melrose Processing Co., [351 F.2d 693, 698 (8th Cir. 1965)] and an implausible explanation by the employer for its action, N.L.R.B. v. Harry F. Berggren & Sons, Inc., 406 F.2d 239, 245–46 (8th Cir.), cert. denied, 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 74 (1969).

McGraw-Edison Co. v. N.L.R.B., *supra*, at 75.

### The Discharge of Ellis

■ Because Section 10(c) of the Act provides that no order of the Board shall require reinstatement of an employee who has been discharged for cause and, further, because aggravated conduct of an employee toward a superior constitutes cause for discharge, we reverse that portion of the Board's order which reinstates employee Ellis and which "makes her whole" for discrimination in overtime assignment *subsequent* to her discharge on March 29, 1972.

The Administrative Law Judge found that at the time of her discharge employee Ellis was engaged in concerted activity, *viz.*, she was registering a complaint with management over discriminatory working conditions. In addition, the Administrative Law Judge found

that the discharge was not caused by Ellis' insubordination but rather by a calculated desire on the part of Yovetich, whom she called a "son-of-a-bitch", to weaken the Union's position in the upcoming election. These findings cannot be supported by the record.

Ellis claims that she objected to the fact that she and employee Rodriguez, who was assisting her at the time, were being made to work late while the "upstairs employees," none of whom supported unionization, were permitted to clean up early. The evidence indicates, however, that two of the three upstairs employees, Ballew and Leslie, worked substantial amounts of overtime and, instead of quitting early each day, generally stayed late. Indeed, they worked overtime on March 29, 1972, the day of Ellis' discharge. Dodig, the other upstairs employee, generally left early. However, it was well known to the Chemvet employees that Dodig was on a different schedule than the rest of them, that each day she began work before they arrived and quit before they did. Thus it is difficult to justify Ellis' complaint and it appears that contrary to her assertion she was not complaining of discriminatory working conditions at the time of her discharge; she was merely defying her employer.

The contention that Ellis was engaging in concerted activity by registering her complaint finds little support in the record. Employee Rodriguez did not join in the argument with Yovetich. Rather, Rodriguez went back to work immediately when ordered to do so. Additionally, employee Ruhl, a staunch union supporter, implored Ellis to cease her protest. Thus, Ellis was not speaking in any representative capacity when, prior to her discharge, she complained that she was being required to work late.

Not only did Ellis defy Yovetich when he told her to return to work, she loudly referred to him as a "son-of-a-bitch" in

his presence. The Administrative Law Judge minimized the importance of these words. Indeed, he found that: "Profane and vulgar verbiage was not unusual in the plant, and it was used by both 'men and women.'" However, the judge was unable to refer to any evidence which indicated that the Chemvet employees regularly or even occasionally referred to their superiors in profane terms in the presence of those superiors. Such an act is different in kind from the general use of profane language. When Ellis had once before addressed one of her fellow employees as a "bitch", she had been reprimanded by management and had been made to apologize. Management took these matters seriously even before the commencement of organizational activity.

■ The Administrative Law Judge found that the profanity could not have had any impact upon Yovetich because he did not fire Ellis on the spot but rather discharged her a minute or two later when she began to upbraid him anew. Such a finding is patently unwarranted. The entire incident lasted only a few minutes. To break it down into separate components as the Administrative Law Judge has tried to do is an artificial gesture. Ellis was discharged because of her defiant, insubordinate and uncooperative attitude, an attitude which found spectacular release on the afternoon of March 29, 1972.

■■ Although employees cannot be discharged for rude or impertinent conduct in the course of presenting grievances, where there is aggravated conduct of an employee toward a superior the protection of Section 7 does not operate to suspend the employer's right to discharge for cause especially when no concerted activity is involved. N.L.R.B. v. Red Top, Inc., 455 F.2d 721, 728 (8th Cir. 1972). "[T]he fact that an employee is a union member and an active movant in an organizational campaign will not shield him from release for good cause." West Point Manufacturing Co.

v. N.L.R.B., 330 F.2d 579, 586 (4th Cir. 1964), citing, N.L.R.B. v. United Brass Works, Inc., 287 F.2d 689, 693 (4th Cir. 1961). Direct defiance of an employer's order is good cause for discharge.

If any semblance of plant discipline is to be maintained, an employee cannot ordinarily be selective in the matter of obeying a supervisor's instructions. If instructions are flagrantly disobeyed, the employee is properly discharged.

N.L.R.B. v. Finesilver Manufacturing Co., 400 F.2d 644, 648–49 (5th Cir. 1968).

While, "a justifiable ground for dismissal of an employee is no defense to an unfair labor charge if such ground was a pretext and not the moving cause," * * * the inference that the discharge was motivated by participation in activities protected by the Act must be based on evidence, direct or circumstantial, and not upon mere suspicion.

N.L.R.B. v. Red Top, Inc., *supra*, at 725.

■ The mere fact that the employer has been guilty of unfair labor practices during the same general time period that the discharge occurred does not supply the requisite evidence of unlawful motive. Standing alone it constitutes nothing more than a "suspicion", and a finding of unlawful motive cannot be based on mere suspicion.

We therefore enforce the order of the NLRB except as it relates to Connie Sue Ellis and as to her we reverse so much of the order as compels her reinstatement and payment to her of any loss of pay as set forth in 2(a) and 2(c) of the Administrative Law Judge's Order dated October 19, 1972, as adopted by the Board in its Order of February 8, 1973, and as modified by the Board in its Supplemental Decision of June 14, 1973.

With respect to overtime back pay, the Board has suggested that this issue would be "best left to the compliance

stage for resolution," citing Westinghouse Pacific Coast Brake Co., 89 NLRB 145 (1950). The Board itself was well aware of the difficulties of a fair and equitable "resolution" when it said, "we find no practicable way to measure how much overtime would have been available or which employees would have availed themselves of overtime opportunities, had they been offered." The Administrative Law Judge had found that, "in 1971, before union organization was attempted, there were weeks in which Ruhl and Terrell worked little or no overtime * * *." The Board gave additional reasons demonstrating the speculative nature of any specific overtime back pay when it said that Ruhl had "made clear at the outset" that "he was not going to be willing to perform as much overtime as he had in the past"; that "Terrell's testimony leaves us in some doubt as to how much additional overtime he would have accepted"; and that "new equipment lessened somewhat the need for overtime."

Although these reasons would appear to militate in favor of enforcing the Boards original Order of February 8, 1973, their subsequent Order of June 14, 1973, showing a change of mind or heart is entitled to equal consideration.

Under these circumstances further facts are required. The employee should receive that which he would have received but for such discriminatory action, if any, as may have been taken against him because of union activity. He is not entitled to receive speculative or ephemeral overtime on what may be characterized as a "might have been" basis. Overtime as a constitutional right has not—as yet—been written into our judicial system. On the other hand, deprivation of reasonably available and routine overtime may be compensable. Fairness to all parties should be achieved by following the Board's suggestion that these issues are "best left to the compliance stage for resolution."