NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

VALMAC INDUSTRIES, INC.,
Respondent.

No. 75–1387.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 13, 1976.

Decided April 20, 1976.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on appendix.

John C. Miller, Acting Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Jay E. Shanklin and Howard E. Perlstein, Attys., N. L. R. B., Washington, D. C., for petitioners.

Bridges, Young, Matthews & Davis, Pine Bluff, Ark., for respondent.

Before GIBSON, Chief Judge, CLARK, Associate Justice, Retired,* and BRIGHT, Circuit Judge.

PER CURIAM.

This controversy arose from the same strike that was the subject of our opinion in *Food Handlers Local 425 v. Valmac,* 528 F.2d 217, decided on December 16, 1975; in that case, we permitted the reformation of the basic labor contract between Valmac and Local 425 because of fraud on the part of Valmac.

On the first day of the strike by Local 425, July 6, 1974, the Plant Superintendent of Valmac made a general request of the office employees to help with production line work during the strike. Two of the three clerical employees agreed to do so, but the third, Brenda Biffle, refused and continued to perform only her clerical duties. Biffle's husband, although not a member of

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

the union, was honoring the picket line and refusing to perform his ordinary production work, i. e. he was on strike. Just before quitting time on July 8th, Brenda Biffle was working alone in the office. Plant Manager Whitlow came in and told her to come prepared the next morning to work in the plant. Biffle told Whitlow she would not do production work because she did not feel that she should "go against the strike", because the production work was difficult, and because she was trained and employed for office work. When Whitlow insisted, Biffle told him that she would quit first. Whitlow quickly explained that he did not wish her to quit and he suggested that she talk it over with her husband. Whitlow's final comment to Biffle was that if she came in the next morning he would assume that she was prepared to work in the plant, but if she failed to report, he would consider her "a quit."

Biffle reported for work the next morning dressed to perform her ordinary clerical duties. Shortly thereafter, Whitlow and Production Supervisor Davenport came into the office. Davenport told her that he had a job for her. Biffle replied that she would not work in the plant; whereupon Whitlow replied that he had to have her work in the plant. She asked if that was all that he had for her to do, and he replied: "Yes, it is. If you can't go out into the plant you will have to go home." Biffle then asked if that meant she was fired, and Whitlow's answer was "yes." On this evidence, the Administrative Law Judge for the Board found that Biffle was "unqualifiedly" discharged on July 9th. We are asked to review that finding.

At the hearing, Whitlow testified that the company contested Biffle's claim for unemployment insurance benefits, and that on her appeal from a disallowance of payments the company maintained that it had terminated her for refusal to do the work assigned to her. With reference to Biffle's reasons for not performing production work in the plant, Whitlow said her reasons were "she had special training in office work and she didn't feel she should go out and work

in the plant." When Whitlow was asked if she gave the same reasons to the unemployment board, he answered: "Much the same, yes, sir." The decision of the referee in the unemployment compensation case, however, recited that Biffle stated that she informed the production manager that she would not work on the production line because it was involved in a labor dispute and that she did not "favor crossing the picket line to do the strikers' work." The Administrative Law Judge found that this discrepancy in Whitlow's testimony seriously impaired his credibility as a witness. On appeal, Valmac underscores the fact that on her termination file Biffle did not indicate that her refusal to do production work was related to the strike. Biffle's testimony, however, indicates that she put down on her termination slip only what she was told to do by the personnel clerk, and the personnel clerk unequivocally supported that fact. All this tends to diminish the weight to be given to the omission on Biffle's termination slip. Valmac claims that Biffle never mentioned the strike as a reason to refuse production work to anyone else. Even if this be true, it would have little bearing upon the fact that she told Whitlow, her Valmac supervisor.

To us it seems strange that Valmac would make such an all-out effort to get Biffle to the production line, to force her to give up her regular duties and perform those of her striking husband. Why did Whitlow suggest that Biffle check with her husband about her refusal to do production work? The comment seems directed as a subtle threat—a signal that she must get her husband to go against the strike or she must go on the production line herself.

■ In any event, it is the established rule in this Circuit that the question of the credibility of witnesses and the weight to be given their testimony in labor cases is primarily one for the determination of the trier of facts. Not unless his resolution of that question is "shocking to our consciences" will we review such determinations. *NLRB v. Morrison Cafeteria Co.,* 311 F.2d 534, 538 (8th Cir. 1963); *Chemvet Lab-*

oratories Inc. v. NLRB, 497 F.2d 445, 449 (8th Cir. 1974). Indeed, the Act itself provides:

The findings of the Board with respect to questions of fact if supported by substantial evidence on the record as a whole shall be conclusive.

29 U.S.C. § 160. We have gone through the record with a fine tooth comb and conclude that the findings of the Board are based upon substantial evidence.

■ The record also shows that Valmac did not offer Biffle reinstatement at the conclusion of the strike nor did Valmac show any overriding business need for refusing to do so. In light of Valmac's affirmative obligation in this regard, reinstatement is not excused simply because she did not request it. The record and findings demonstrate that she was permanently and unqualifiedly discharged when she refused to perform struck work. She, therefore, had no reason to believe that notifying Valmac of her willingness to resume work would obtain her reinstatement. To go through the motions of such notification "would have been a completely useless ritualistic act." NLRB v. Southern Greyhound lines, Inc., 426 F.2d 1299, 1303 (5th Cir. 1970).

The petition for enforcement is, therefore, granted.