**KEOKUK GAS SERVICE CO.,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 77–1953.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1978.
Decided July 26, 1978.

James J. Salzman, Chicago, Ill., argued and on brief, for petitioner.

Elinor Hadley Stillman, Atty., N. L. R. B., Washington, D. C., argued, for respondent; Marjorie S. Gofreed and Frank T. Mamat, Attys., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on brief.

Before STEPHENSON, Circuit Judge, INGRAHAM, Senior Circuit Judge,* and HENLEY, Circuit Judge.

INGRAHAM, Circuit Judge.

This labor dispute involves an unfair labor practice charge against the employer arising from the discharge of an employee who, in response to the employer's offer of milder punishment and after consultation with a union representative, threatened to present a grievance. The administrative law judge found that the employer violated § 8(a)(1) of the National Labor Relations

---

* The Honorable Joe Ingraham, United States Senior Circuit Judge for the Fifth Circuit, sitting by designation.

Act, 29 U.S.C. § 158(a)(1) (1970), and ordered the employer to cease and desist from such unlawful conduct and provide specific affirmative relief including back pay. The National Labor Relations Board affirmed the rulings, findings and conclusions of the administrative law judge, except for modifying the measure of interest. *Keokuk Gas Service Co. and Oil, Chemical & Atomic Workers International Union,* 233 N.L.R.B. No. 76 (1977). The employer petitions this court to review and set aside the Board's order, while the Board cross-applies for enforcement. We hold that the Board has applied the law correctly and that the findings were supported by substantial evidence on the record considered as a whole. Accordingly, we grant the Board's cross-application for enforcement and deny the employer's petition to set aside.

The employer, Keokuk Gas Service Company, is an Illinois corporation engaged in the retail distribution of natural gas, with an office and place of business in Keokuk, Iowa. The discharged employee, Robert Neff, had worked for Keokuk as a customer service representative or district serviceman for ten and one-half years prior to his termination on July 29, 1976.

From 1974 until his discharge, Neff actively supported representation of Keokuk's employees by the Oil, Chemical & Atomic Workers International Union.[1] He was organizing chairman for the union from the inception of its campaign. From August 1, 1974, the date of certification of the union as the exclusive bargaining representative, until his discharge, Neff served as Vice-President of the union and as a union steward.

Following union certification, Neff was reprimanded periodically. On October 7, 1974, Neff was admonished for exceeding his authority in advising a serviceman to include on his time sheet the time lost in searching for a compressor. On November 26, 1974, Neff was suspended for a week without pay for taking lengthy coffee breaks, poor workmanship and failure to return a meter. On March 25, 1975, Neff was again warned that his coffee breaks were too long, but no discipline was imposed.[2]

Although Keokuk and the union participated in collective bargaining sessions following union certification, no agreement was reached. On July 21, 1975, some Keokuk employees went on strike until July 29, when the union made an unconditional offer for striking employees to return to work. Seventeen employees returned to work on December 15, 1975, after Keokuk issued an unconditional offer.

On the same date, Keokuk unilaterally adopted a personnel policy that resembles a collective bargaining agreement in its coverage and application to "Bargaining Unit Employees."[3]

Neff received further reprimands after the employees returned to work. On March 29, 1976, Neff's standby pay was docked because of his unavailability for a standby call the preceding day.[4] On June 4, 1976, Neff was reprimanded for disobeying company regulations with respect to meter removal and deposit collection. On June 14, 1976, Neff was berated for carelessly failing to check an appliance and light a gas pilot while working in the home of Keokuk's Vice-President and General Manager,

---

1. Prior to union certification, Keokuk employees were represented by the Keokuk Gas Service Company Employees' Association. Neff served as President of the Association in 1969.

2. Neff claimed that his long coffee breaks were excusable in light of interruptions by complaining customers.

3. No allegation has been made that the unilateral adoption of the personnel policy violated § 8(a)(5), National Labor Relations Act, 29 U.S.C. § 158(a)(5) (1970). *See N. L. R. B. v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230

(1962). The instituted policy was apparently Keokuk's final offer prior to the impasse in bargaining. *See generally* R. GORMAN, BASIC TEXT ON LABOR LAW §§ 10–14 (1976).

4. Neff claims that, in accord with Keokuk's policy, he called in and left the telephone number of the restaurant where he could be reached for standby duty. Apparently, when the dispatcher called the restaurant, the person who answered the phone thought that Neff had departed.

C. Benson Dushane, III. On July 16, 1976, Neff was dressed down for turning on the wrong meter at an apartment complex and failing to light the pilots connected to the open line.[5]

The final reprimand prior to discharge was on July 23, 1976. Neff was censured for leaving "C.G.I.," or can't get in, cards at the homes of persons whose meters were to be removed for non-payment of bills when, in fact, Neff had not made sufficient effort to determine if such persons were home or left the cards knowing that such persons were home.[6] In a meeting with Director of Utilization William Patchell and Customer Service Supervisor Michael Conn, Neff was told by Patchell that the company had two options: a severe reprimand and time off, or discharge from employment. Patchell directed Neff to meet in his office on Monday morning, July 26, 1976, for the decision. He further instructed Neff to contact him or Conn over the weekend, if Neff had anything further to add.

During the weekend of July 23, 1976, Neff contacted neither Patchell nor Conn but union representative Ray Lovelady to request representation at the Monday meeting. Neff met alone with Patchell and Conn on Monday morning, July 26, 1976. At the outset of the meeting, Patchell read to Neff from the grievance provision of the personnel policy.[7] Patchell stated that his tentative decision was to discharge Neff but that a final decision would not be made until a meeting with Lovelady in the afternoon. At the afternoon meeting, joined in by Lovelady and Operations Superintendent Jack Ketterer,[8] Lovelady took issue with many of the reports in Neff's personnel file, adverted to Neff's letters of commendation and merit pay increases, and requested that the company reconsider the disciplinary measure. Patchell acceded to the request for reconsideration and recessed the meeting until the next day, July 27, 1976.

On the evening of July 27, Customer Service Supervisor Conn presented the company's proposed punishment: (1) five days off without pay, (2) one year probation with periodic performance reviews, and (3) reduction in pay grade by one step.

The response to the disciplinary proposal was a mixed one. Lovelady told Conn and Patchell that were he in Neff's shoes, he would tell them to "shove it up their ass." Patchell stated that if Neff felt likewise, the offer would be rescinded. After conferring with Neff, Lovelady announced that Neff's opinion of the proposal paralleled his own, but that Neff would accept the punishment, file a grievance and submit to arbitration. When Neff confirmed that such was his decision, Patchell stated that the offer was officially withdrawn and that Neff was suspended for three days and thereafter fired.

A grievance was filed with Conn on July 28, 1976, and rejected the following day,

---

5. Neff claims that the meters and bars were "all messed up." Customer Service Supervisor Michael Conn told Neff that he violated company policy by failing to report the hazard. Aside from a verbal and written reprimand, Neff received no discipline for this incident.

6. Customer Service Supervisor Conn tried to verify several C.G.I. reports, when the accounting office relayed its concern.

7. Section 4. Discipline & Discharge. In the event the Company concludes that a regular employee's conduct justifies discharge, the employee shall first be suspended for three (3) workdays. If the employee believes he has been unjustly dealt with, he may file a grievance, provided that such grievance is filed within three (3) workdays from the date of suspension. Upon request from the Union, a hearing shall be afforded the affected employee prior to the end of his suspension period in an effort to dispose of such case. At such hearing, the Company shall disclose all facts known to it regarding the proposed discharge and the reasons for its action. This period may be extended by mutual agreement between the parties.

With respect to offenses of less serious nature, copies of all disciplinary notices and any further action will be furnished by the Company to the employee involved. Records of previous disciplinary action against an employee shall not be retained in the employee's personnel file beyond two (2) years from the date of the occurrence involved in the disciplinary action.

8. Ketterer was a union steward as well as a fellow employee of Neff.

July 29, when Neff's termination became effective.

The union filed unfair labor practice charges against Keokuk, alleging multiple violations of § 8(a)(1), (3) and (4) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) and (4) (1970). Two independent § 8(a)(1) violations were alleged: (1) convening the initial disciplinary meeting without the presence of the requested union representative, and (2) discharging Neff because of his threats to file a grievance. The alleged § 8(a)(3) and corresponding § 8(a)(1) violation was that Keokuk reprimanded Neff because of his union activities. The alleged § 8(a)(4) and corresponding § 8(a)(1) violation was that Keokuk discharged Neff because of his threat to lodge unfair labor practice charges.

A hearing was convened before an administrative law judge, who dismissed on the merits the alleged unfair labor practice charges brought under § 8(a)(3) and 8(a)(4) and the corresponding allegations under § 8(a)(1). The allegation that Keokuk had violated § 8(a)(1) by convening the initial disciplinary meeting without the presence of the requested union representative was also dismissed on the merits, because the final disciplinary decision was expressly reserved for a later meeting with the union representative.

The administrative law judge concluded that Keokuk had violated § 8(a)(1) by dismissing Neff for his threat to file a grievance. The conclusion was based upon two findings: (1) that Neff's threat to file a grievance in protest of his punishment was a protected concerted right under § 7; and (2) that Keokuk's reflexive withdrawal of the milder punishment and peremptory dis-

charge of Neff was in retaliation for the assertion of this § 7 right.[9] Keokuk was ordered to cease and desist from violating § 8(a)(1), to reinstate Neff to the position he would have occupied but for its interference with his § 7 rights, and to make him whole for any losses suffered by reason of such interference.[10]

Keokuk filed exceptions to the administrative law judge's decision on July 29, 1977. A three-member panel of the National Labor Relations Board affirmed the rulings, findings and conclusions of the administrative law judge and adopted his proposed order, except that the remedy was modified so that interest would be calculated according to *Florida Steel Corp.,* 231 N.L.R.B. No. 117 (1977). *Keokuk Gas Service Co. and Oil, Chemical & Atomic Workers International Union,* 233 N.L.R.B. No. 76 (1977).

The case is before this court on Keokuk's petition to review and set aside the Board order under § 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f) (1970), and the Board's cross-application for enforcement under § 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (1970).

Keokuk argues that Neff's threat to file a grievance challenging the punishment was not, as a matter of law, a protected concerted right under § 7, for two reasons: (1) there was no collective bargaining agreement; and (2) any grievance filed by Neff would be for his interest alone. We must first determine whether the Board misapplied the law in finding such conduct protected. *N. L. R. B. v. Insurance Agents' International Union,* 361 U.S. 477, 498, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); *Inter-Colle-*

---

**9.** Section 7, National Labor Relations Act, 29 U.S.C. § 157 (1970), provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring mem-

bership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

**10.** Other affirmative relief was ordered by the administrative law judge: to preserve all records necessary to calculate the back pay and other benefits due Neff; to strike and expunge all records of the discharge; to post an official notice of the relief granted at its plant; and to notify the appropriate Board officials of steps taken to comply with the order.

*giate Press, Graphic Arts Division v. N. L. R. B.,* 486 F.2d 837, 840 (8th Cir. 1973), *cert. denied,* 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 288 (1974).

■ Invoking a grievance procedure pursuant to a collective bargaining agreement is clearly a protected § 7 right, albeit a derivative right, "because the collective bargaining agreement is the result of concerted activities by the employees for their mutual aid and protection." *N. L. R. B. v. Selwyn Shoe Manufacturing Corp.,* 428 F.2d 217, 221 (8th Cir. 1970). If the exercise of such right is to be guaranteed, the threat of its exercise must be equally protected.[11]

■ The absence of a collective bargaining agreement does not render the threat to invoke a grievance procedure unprotected by § 7. The Seventh Circuit has generalized that § 7 "protection remains viable only if interpreted to encompass not only activity which occurs within the confines of a formal grievance proceeding, but also conduct which intends or contemplates as its end-result group activity which will benefit the participants in their status as employees." *Dreis & Krump Manufacturing Co. v. N. L. R. B.,* 544 F.2d 320, 327 (7th Cir. 1976).

The District of Columbia Circuit has expressly held that reliance upon a grievance mechanism is protected by § 7 even if there is no collective bargaining agreement. *Oil, Chemical & Atomic Workers International Union v. N. L. R. B.,* 178 U.S.App.D.C. 278, 291, 547 F.2d 575, 592 (1976).[12] One employee sought to represent a fellow employee at a disciplinary meeting with the plant superintendent concerning reinstatement of the latter employee following his suspension for fighting on the job. Both employees were discharged for insisting on the representation. The discharges were held to infringe upon the employees' § 7 right to act in concert, notwithstanding the absence of both a collective bargaining agreement and a grievance mechanism.

Section 7 expressly provides that employees are protected not only in collective bargaining activities but "in other concerted activities for the purpose of . . . other mutual aid or protection." Section 7 rights are therefore not delimited by the four corners of a collective bargaining agreement. Therefore, a shop steward insisting on a company's acceptance of seniority protection from layoffs "is engaging in a concerted activity for the employees' 'mutual aid and protection,' within the meaning of Section 7 of the Act when he attempts to have such rights recognized by the employer, even though they may not be guaranteed by the bargaining agreement." *Metal Blast, Inc. v. N. L. R. B.,* 324 F.2d 602, 603 (6th Cir. 1963).

■ Keokuk further argues that Neff's proffered intention to file a grievance is not, as a matter of law, a protected concerted right under § 7, because Neff was acting solely in his self-interest. Neff's threat was concerted in that it was made upon consultation with and in the presence of union representative Lovelady and fellow employee Ketterer. However, this court has stated that "[t]he requirement of concertedness relates to the end, not the means." *N. L. R. B. v. Sencore, Inc.,* 558 F.2d 433, 434 (8th Cir. 1977).

Although the immediate end sought by invoking a grievance procedure is the adjustment of individual complaints, the triggering of the grievance mechanism affects all employees. The grievance adjustment process itself is analogous to the collective bargaining process in that it affords a means of interpreting the conditions of employment. *Cf. Emporium Capwell Co. v. Western Addition Community Organization,* 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975).[13] The resolution of a grievance es-

---

11. Neff's threat to file a grievance was not "mere griping" but a serious expression of formal protest. *Cf. Mushroom Transportation Co. v. N. L. R. B.,* 330 F.2d 683, 685 (3d Cir. 1964).

12. *Cf. N. L. R. B. v. Gibbs Corp.,* 284 F.2d 403 (5th Cir. 1960), where an employee's discharge

was upheld without mention of whether the employee's grievance was presented pursuant to a collective bargaining agreement.

13. In *Emporium Capwell Co.,* the Court held that minority group employees do not have a § 7 right to bypass the active efforts of their

tablishes a precedent that might benefit or harm other employees with similar grievances. *Ostrofsky v. United Steelworkers of America,* 171 F.Supp. 782, 793 (D.Md.1959), *aff'd per curiam,* 273 F.2d 614 (4th Cir.), *cert. denied,* 363 U.S. 849, 80 S.Ct. 1628, 4 L.Ed.2d 1732 (1960). Where, as here, the union is involved in the threat to present a grievance, the union's obligation to protect the interests of all employees in the bargaining unit further insures that the end to be served is a "concerted" one for the employees' "mutual aid or protection." [14] *See Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

Recognition of a § 7 right to present or threaten to present grievances serves the public policies of industrial stability and peaceful resolution of labor disputes as well as judicial economy. The Congressional preference for dispute settlement by grievance procedures is clear. *See* §§ 201(c), 203(d), Labor Management Relations Act, 29 U.S.C. §§ 171(c), 173(d) (1970).

Keokuk argues that even if Neff's threat to file a grievance was a protected § 7 right, Keokuk did not discharge Neff because of his assertion of that right. Keokuk asserts that Neff was discharged before he expressed his intention to file a grievance. Alternatively, Keokuk contends that Neff was discharged "for cause." [15]

■ The Board's findings must be sustained if they are supported by substantial evidence on the record considered as a whole. Section 10(e)–(f), National Labor Relations Act, 29 U.S.C. § 160(e)–(f) (1970); *Universal Camera Corp. v. N. L. R. B.,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Amyx Industries, Inc. v. N. L. R. B.,* 457 F.2d 904, 906 (8th Cir. 1972). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support the conclusion." *Consolidated Edison Co. v. N. L. R. B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938), *quoted in Amyx Industries, Inc.,* 457 F.2d at 907. If "the record in a Board determination presents facts that propose conflicting inferences, it is not for us to disagree with the findings of the board," *Crenlo, Division of GF Business Equipment, Inc. v. N. L. R. B.,* 529 F.2d 201, 205 (8th Cir. 1975), "even though the court would justifiably have made a different choice had the matter been before it de novo," *Northern Petrochemical Co. v. N. L. R. B.,* 469 F.2d 352, 355 (8th Cir. 1972). In reviewing the record, we are also bound by the factfinder's assessment of "credibility of witnesses and the weight to be given their testimony," unless such assessment is "shocking to our conscience." *N. L. R. B. v. Valmac Industries, Inc.,* 533 F.2d 1075, 1076 (8th Cir. 1976).

■ Substantial evidence on the record considered as a whole supports the Board's finding that Neff threatened to file a grievance before he was fired. Patchell testified that the punishment offer was only "unofficially" withdrawn before Neff responded and after Lovelady expressed his disapproval of the terms. The administrative law judge could reasonably have inferred that the offer was not "officially" withdrawn, nor Neff dismissed, until Neff verbalized

union to remedy employment discrimination where the collective bargaining agreement prohibits the employer's practices at issue. 420 U.S. at 70, 95 S.Ct. 977. As the Fifth Circuit recently observed, "we find nothing in *Emporium Capwell* or the cases cited therein which indicates that an employer may with impunity discharge an employee for the simple act of presenting a grievance or . . . preparation for presentation of a grievance." *Richardson Paint Co. v. N. L. R. B.,* 574 ,F.2d 1195 at 1207 (5th Cir. June 12, 1978).

**14.** In a decision granting employees the right to a union representative at meetings which the employees reasonably believed would result in disciplinary action, even the dissenters acknowledged that "the § 7 right . . . to act 'in concert' in employer interviews, also exists in the absence of a recognized union." *N. L. R. B. v. J. Weingarten, Inc.,* 420 U.S. 251, 270 n. 1, 95 S.Ct. 959, 969, 43 L.Ed.2d 171 (1975) (Powell, J., dissenting).

**15.** Section 10(c), National Labor Relations Act, 29 U.S.C. § 160(c) (1970) provides in pertinent part: "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause."

his sentiments and intention regarding the offer. Likewise, it was reasonable for the administrative law judge to resolve the dispute over whether Neff expressly stated his intention to file a grievance by crediting the testimony of Neff, Lovelady and Ketterer and discrediting that of Conn and Patchell.[16]

Substantial evidence on the record considered as a whole supports the Board's finding that Neff was discharged not "for cause," but for threatening to file a grievance. In a similar case involving a violation of § 8(a)(3), as well as § 8(a)(1), the Fourth Circuit held that "an unfair labor practice may be found only if there is a basis in the record for a finding that the employee would not have been discharged, though he may have been subjected to a milder form of punishment for the offense, except for the fact of his union activity." *Neptune Water Meter Co. v. N. L. R. B.,* 551 F.2d 568, 570 (4th Cir. 1977). The finding that Neff would have received milder punishment but for his threat to file a grievance is substantiated by the record. As punishment for Neff's misconduct, Conn proposed a reduction in pay after a five day layoff and periodic review of his performance. When Neff agreed to accept the punishment but file a grievance to protest the terms, Patchell's immediate reaction was to withdraw the milder punishment and to discharge him.[17]

The threat to assert a § 7 right must be protected if the exercise of such right is to be fully secured. An employer's discharge of employees threatening to assert a § 7 right inherently discourages exercise of such right, in violation of § 8(a)(1). Keokuk's discharge of Neff for his threat to present a grievance violated § 8(a)(1). Accordingly, we affirm the decision of the National Labor Relations Board, deny Keo-

kuk's petition to set aside the Board's order and grant the Board's cross-application for enforcement of its order.

ENFORCED.

---

**16.** Conn and Patchell testified that, when Neff accepted the punishment offered, Neff did not immediately state that he would file a grievance but merely said he was accepting "under protest."

**17.** Keokuk cannot rely upon the profanities uttered by Neff and Lovelady to justify the discharge. *See Chemvet Laboratories, Inc. v. N.*

L. R. B., 497 F.2d 445, 452 (8th Cir. 1974). "The employee's right to engage in concerted activity may permit some leeway for impulsive behavior," *e. g.,* addressing a plant superintendent as a "horse's ass" during a grievance presentation. *N. L. R. B. v. Thor Power Tool Co.,* 351 F.2d 584, 586–87 (7th Cir. 1965).