Joyce Louise SANDERS, Appellant,

v.

YOUTHCRAFT COATS AND SUITS, INC.; Northwestern District Council of the Central States Region International Ladies Garment Workers' Union, AFL–CIO, Appellees.

No. 82–1357.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1982.

Decided March 3, 1983.

Michael Thompson and Kelly P. Finn, Legal Aid of Western Missouri, Kansas City, Mo., for appellant.

John D. Dunbar, Kansas City, Mo., for appellee Youthcraft Coats and Suits, Inc.; Margolin & Kirwan, Kansas City, Mo., of counsel.

Morris J. Levin, Levin & Weinhaus, St. Louis, Mo., for appellee Northwestern Dist. Council of the Central States Region, Intern. Ladies' Garment Workers' Union; Jerome J. Dobson, St. Louis, Mo., of counsel.

Before BRIGHT and McMILLIAN, Circuit Judges, and HARRIS,* Senior District Judge.

McMILLIAN, Circuit Judge.

Joyce Sanders appeals from a final judgment entered in the District Court for the Western District of Missouri[1] after a bench trial which found that appellee Northwestern District Council of the Central States Region, International Ladies Garment Workers' Union, AFL–CIO (the Union) did not breach its duty of fair representation towards appellant Sanders and that appellee Youthcraft Suits and Coats, Inc. (Youthcraft) fired Sanders for good and sufficient cause. For reversal, Sanders argues that both findings are in error. First, Sanders contends that the Union breached its duty of fair representation by failing to adequately analyze and advise her about the merits of her grievance against Youthcraft. Second, Sanders contends that Youthcraft discharged her for engaging in activity pro-

tected under § 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1975), and, therefore, her discharge was unlawful. For the reasons discussed below, we affirm the judgment of the district court.

Sanders was employed by Youthcraft from 1963 until she was fired on November 30, 1979.[2] At all times relevant to this appeal, Youthcraft had a collective bargaining agreement with the Union. Sanders was a member of the Union and also was a union shop chairperson at Youthcraft. The union shop chairperson's function is to help enforce the collective bargaining agreement between the Union and the employer at the shop level. Because of Sanders' position as a union shop chairperson, she participated in an industry-wide union/employer committee meeting. Sanders was accompanied at the meeting by two other Youthcraft employees. The Union and Youthcraft agreed that they would split the cost of compensating Sanders and the two other Youthcraft employees for their time spent at the meeting. But before Youthcraft would pay its half, it wanted a letter from the Union confirming the fact that other employers also paid their employees who attended the meeting.

By November 30, 1979, Sanders had not yet received the Youthcraft half of the meeting pay. So, before her morning shift started, Sanders went to see George Rosenfeld, Youthcraft's Director of Production and Personnel, to confront him about the late payment. Along the way, Sanders met Edith Tuttle, one of the other Youthcraft employees who attended the union/employer meeting. Sanders told Tuttle that she was going to talk to Rosenfeld about the meeting pay. Tuttle asked Sanders to inquire about her pay as well.

What transpired between Sanders and Rosenfeld in Rosenfeld's office is highly

* The Honorable Oren Harris, United States Senior District Judge for the Eastern and Western Districts of Arkansas, sitting by designation.

1. The Honorable Joseph E. Stevens, Jr., United States District Judge for the Western District of Missouri.

2. Sanders left Youthcraft for six months in 1967, but was employed continuously with Youthcraft from July 10, 1967 until November 30, 1979.

contested by the parties. According to Rosenfeld, Sanders became extremely agitated, abusive and profane after he told her that the meeting pay would not be on that day's paycheck. Rosenfeld explained that the Union's confirmation letter had not been received in time to have the meeting pay placed on Youthcraft's computerized payroll and that Sanders could expect to receive payment in her next paycheck. Sanders demanded immediate payment by separate check and made a disparaging remark about Youthcraft's president, Leon Karosen. Rosenfeld then told Sanders to calm down and reminded her that she was the subject of previous disciplinary reports concerning her insubordination. The last of these disciplinary reports warned Sanders that any future act of insubordination would result in her immediate discharge. Sanders responded by stating that the previous disciplinary report was groundless and that Rosenfeld and Karosen "were both liars." After Sanders made this statement, Rosenfeld asked her to repeat it to two Youthcraft employees who had just entered Rosenfeld's office. Sanders complied and Rosenfeld fired her.

Sanders denies that Rosenfeld's version of the incident is true. According to Sanders, she calmly demanded prompt payment for the time she spent at the union/employer meeting. When Rosenfeld mentioned the previous disciplinary reports, Sanders said she merely stated that the charge against her "was a lie."

The same day Sanders was fired, November 30, 1979, Sanders contested her discharge by filing a written grievance as required by the collective bargaining agreement. A hearing was held on December 17, 1979. Youthcraft's position at the initial hearing was that it would not reinstate Sanders. At a subsequent grievance meeting held on February 26, 1980, the Union was able to convince Youthcraft to reconsider and reinstate Sanders without loss of seniority. Youthcraft was adamant, however, that it would not give Sanders any back pay. Lillian McKittrick, the Union representative who appeared on Sanders'

behalf, told Sanders that Youthcraft's offer was fair and that Sanders should accept it. But McKittrick told Sanders that the decision was Sanders' alone. Sanders decided to reject the offer because she still wanted full back pay. Thereupon, Youthcraft withdrew its offer.

On April 24, 1980, Union vice-president Glenn Clay met with Sanders to discuss taking her grievance to arbitration. At the meeting, Sanders gave Clay her version of the incident. Clay asked Sanders whether she had any corroborating witnesses. Sanders replied that she did have a witness, but she would not reveal the witness's name to Clay. Clay testified that he tried to convince Sanders to reveal her witness's name by stressing the importance of corroborating her version of the incident, especially when the employer had two witnesses who would corroborate Rosenfeld's version of the incident. Sanders still refused to reveal her witness's name.

The meeting between Clay and Sanders was interrupted at noon by Sanders' brother who reminded her that she had to keep an afternoon appointment to do volunteer modeling. Sanders said she offered to return and continue the meeting after her appointment, but Clay testified she did not make such an offer. In any event, Sanders did not return to the Union's office that day.

Sometime after this meeting broke up, Clay decided not to pursue Sanders' grievance to arbitration. Clay testified that, based on consultation with Union counsel, and on his own experience in arbitration, he concluded that Sanders could not hope to do better than Youthcraft's offer of full reinstatement without back pay. The Union wrote Sanders a letter, dated April 24, 1980, which stated that because Sanders still demanded full back pay, would not identify her corroborating witness, could not offer new evidence, and had not devoted sufficient time to the pre-arbitration meeting with Clay, the Union could not pursue Sanders' grievance further. Sanders did not attempt to appeal this decision through

internal Union procedures until after this lawsuit was filed. Instead, she filed unfair labor practice charges against the Union and Youthcraft with the National Labor Relations Board (NLRB). The NLRB, however, refused to issue a complaint against either the Union or Youthcraft. Sanders then brought this § 301[3] suit against both the Union and her employer.

## I. THE UNION'S DUTY OF FAIR REPRESENTATION

Because a union is given exclusive bargaining rights under a collective bargaining agreement, federal law imposes upon the union the concomitant duty to represent fairly all the workers covered by that collective bargaining agreement. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 337, 73 S.Ct. 681, 685, 97 L.Ed. 1048 (1953). A union breaches its duty of fair representation when its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916–917, 17 L.Ed.2d 842 (1967). Sanders does not contend that the Union discriminated against her, or that the Union acted in bad faith. Her position is that the Union acted arbitrarily in (1) failing to analyze properly the merits of her grievance and (2) failing to advise her about the viability of her grievance before Youthcraft withdrew its offer of reinstatement. *See Robesky v. Qantas Empire Airways, Ltd.,* 573 F.2d 1082 (9th Cir.1978); *De Arroyo v. Sindicato De Trabajadores Packinghouse,* 425 F.2d 281, 284 (1st Cir.), *cert. denied,* 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970). We will address each allegation in turn.

### A. *The Union's Analysis of Sanders' Grievance*

Sanders claims that she went to Rosenfeld's office, in her role as union shop chairperson, to inquire about payment for the time she *and* another Youthcraft employee

spent at a collective bargaining meeting. Sanders asserts that this was concerted activity protected under § 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1975). In Sanders' view, she could not be lawfully discharged while engaging in protected activities, even if she did call Rosenfeld and Karosen liars. *Compare Hugh H. Wilson Corp. v. NLRB,* 414·F.2d 1345, 1348–49 (3d Cir.1969), *cert. denied,* 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 111 (1970), *with Chemvet Laboratories, Inc. v. NLRB,* 497 F.2d 445 (8th Cir.1974), *and Crown Central Petroleum Corp. v. NLRB,* 430 F.2d 724, 731 (5th Cir.1970). Sanders argues that because the Union investigated the factual and legal basis of her grievance in a casual and perfunctory manner, it failed to recognize the merits of her protected activity claim and thus breached its duty of fair representation.

A union does not act arbitrarily simply because it does not pursue a grievance that it has decided lacks merit. This is true even if a judge or jury later determines that the grievance is meritorious. *Vaca v. Sipes,* 386 U.S. at 193, 87 S.Ct. at 918. Indeed, because the union's duty of fair representation is a collective duty, owed equally to all members of the bargaining unit, courts have ruled that the union has the affirmative duty not to press grievances which the union believes, in good faith, do not warrant such action. *See Smith v. Hussmann Refrigerator Co.,* 619 F.2d 1229, 1241 n. 12 (8th Cir.) (en banc), *cert. denied,* 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980), *citing Bazarte v. United Transportation Union,* 429 F.2d 868, 872 (3d Cir.1970). The Union did investigate the factual circumstances of Sanders' discharge. Union vice-president Clay did consult with counsel about the legal and practical repercussions of those facts. It does not appear from the record that the Union's investigation and analysis of Sanders' grievance, even if erroneous, was perfunctory, unreasonable, irrational, or "arbitrary."[4] The

---

**3.** Labor Management Relations Act, Title III, § 301, 29 U.S.C. § 185 (1975).

**4.** We decline to express an opinion on the merits of Sanders' protected activity argument due

**1230**

district court specifically found that the Union did not represent Sanders in a perfunctory or casual fashion, but rather, handled and processed her grievance fairly and in good faith after due consideration of all the relevant evidence that was available. *Sanders v. Youthcraft Coats & Suits, Inc.,* No. 80–1038–CV–W–8, slip op. at 9 (W.D.Mo. Feb. 8, 1982). These factual findings are not clearly erroneous. The Union's analysis of Sanders' grievance, therefore, did not constitute a breach of its duty of fair representation.[5]

**B.** *The Union's Advice*

Sanders further argues that even if the Union legitimately could conclude that her grievance was not worth pursuing to arbitration, the Union should have advised her fully about its position so that she could have had "an opportunity to accept the company's offer in light of the Union's expert evaluation." Appellant's Brief at 20. Sanders relies heavily on two cases—*Robesky v. Qantas Empire Airways, Ltd.,* 573 F.2d 1082 (9th Cir.1978), and *Ruzicka v. General Motors Corp.,* 523 F.2d 306 (6th Cir.1975).

In *Robesky v. Qantas Empire Airways,* Qantas discharged an employee for excessive absenteeism. The employee's union convinced Qantas that it should reconsider

and offer to reinstate the employee. Qantas agreed to offer reinstatement without back pay and seniority. In exchange, the union agreed to withdraw the employee's grievance from arbitration. The employee rejected Qantas's offer, however, in the belief that her meritorious grievance was proceeding through arbitration. By rejecting the offer, the employee foreclosed the possibility of being reinstated because the union had already withdrawn from arbitration. The employee alleged in a later § 301 suit that the union breached its duty of fair representation by failing to tell her before she rejected Qantas's offer that the union had withdrawn from arbitration. The employee asserted that, had she known that the arbitration had terminated, she would have accepted the offer. The Ninth Circuit ruled that if the union, in fact, did not tell the employee that arbitration had ended, a jury could possibly conclude that the union had breached its duty of fair representation. The court remanded the case to the district court for factual findings on the issue. 573 F.2d at 1087–88.

In *Ruzicka v. General Motors,* General Motors discharged an employee for being intoxicated on the job. The employee submitted a grievance to the union claiming that his discharge was an unduly harsh penalty. The union made no decision about

---

to Sanders' failure to raise it during the proceedings below. *Cato v. Collins,* 539 F.2d 656, 662 (8th Cir.1976). We do note, however, that because Sanders' protected activity argument was not raised below, its currency also escaped the attention of Sanders' trial counsel and the district court. Thus, the Union's inability to perceive Sanders' meeting with Rosenfeld as protected activity is at most a good faith error rather than arbitrary conduct.

**5.** Sanders cites several cases in her brief which purport to hold that a union's ignorance of the legal significance of a union member's grievance constitutes a breach of the union's duty of fair representation. None of the cited cases so hold. At most these cases stand for the proposition that the union has a duty to apprise itself of the readily ascertainable facts of the member's grievance. *See Milstead v. International Bhd. of Teamsters, Local 957,* 580 F.2d 232, 235 (6th Cir.1978) (union was ignorant of relevant

contract provision); *De Arroyo v. Sindicato De Trabajadores Packinghouse,* 425 F.2d 281, 284 (1st Cir.1970) (*De Arroyo*) (union failed to realize union members were laid off due to automation rather than subcontracting and failed to note the members' correct years of service). In addition, these cases were decided upon a narrow standard of review and either upheld the trier-of-fact's conclusion that the union's conduct was irrational and perfunctory, *De Arroyo,* 425 F.2d at 285, or held that the Union was not entitled to a judgment notwithstanding the verdict or a directed verdict, *Smith v. Hussmann Refrigerator Co.,* 619 F.2d 1229, 1235 (8th Cir.) (en banc) (JNOV overturned), *cert. denied,* 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980); *Milstead v. International Bhd. of Teamsters, Local 957,* 580 F.2d at 235 (upholding trial court's denial of a directed verdict). As in the above cases, our decision is controlled by the standard of review and the trier-of-fact's findings.

the merits of the grievance and never filed it with the employer. Eventually the time limitation for processing the grievance passed and GM disclaimed any further obligation to review the discharge as was its right under the collective bargaining agreement. The district court ruled that because the union was merely negligent and had not acted in bad faith or out of hostility, the union had not breached its duty of fair representation. The Sixth Circuit reversed, holding that bad faith was not required to prove a breach of a union's duty of fair representation. The Sixth Circuit further held that the union's perfunctory and negligent handling of the grievance, "unrelated as it was to the merits of Appellant's case, amounts to unfair representation." 523 F.2d at 310.

The facts of the present case are not comparable to those of either *Robesky v. Qantas* or *Ruzicka v. General Motors.* Here, the Union kept Sanders fully informed about the progress of her grievance up until the point it decided not to proceed to arbitration. The Union's decision was based on the merits of Sanders' grievance. During the meeting at which Youthcraft first offered to reinstate Sanders without back pay, Sanders was advised by a union representative that the offer was fair. The union representation also told Sanders that considering the layoffs at Youthcraft, accepting the offer was probably the best thing for Sanders, but the ultimate decision would have to be made by Sanders herself. Sanders made her decision and rejected the offer.

■ When the Union informed Sanders that they would not take her grievance to arbitration, Sanders was not foreclosed from gaining reinstatement. We believe that if Sanders had consented to reinstatement without back pay, the Union in all probability could have had Youthcraft retender its offer. But Sanders persisted in demanding full back pay even after the Union advised her that in its opinion arbi-

tration would not result in anything more than what was offered by Youthcraft and therefore the Union would not pursue arbitration. Sanders did not appeal the Union's decision, nor did she request the Union to persuade Youthcraft to retender its offer of reinstatement without back pay. Instead, Sanders filed this lawsuit for reinstatement with back pay. The record supports the conclusion that it was Sanders' desire for back pay and not the Union's failure to advise her on the merits of her grievance that led Sanders to reject Youthcraft's offer. *See Bazarte v. United Transportation Union,* 429 F.2d at 872 (union's failure to inform member of its decision not to go forward with member's case insufficient to establish unfair representation absent showing of prejudice). The district court found as fact that the Union did not represent Sanders in a perfunctory or casual fashion or in a manner contrary or adverse to her interests. These findings are not clearly erroneous and are supported by evidence in the record. Sanders has failed to prove that the Union breached its duty of fair representation.

## II.  UNLAWFUL DISCHARGE

■ By not proceeding to arbitration, Sanders has not exhausted her contractual remedies under the collective bargaining agreement. She is therefore precluded from maintaining a § 301 suit against Youthcraft unless she can show that the Union breached its duty of fair representation. *Vaca v. Sipes,* 386 U.S. at 186, 87 S.Ct. at 914–915. As discussed above, Sanders is unable to prove that the Union breached its duty of fair representation in processing her grievance. Thus, it is unnecessary to reach the merits of Sanders' unlawful discharge argument as it relates to Youthcraft's liability.[6] Accordingly, the district court's judgment is affirmed.

---

6. We do note in passing that because Sanders failed to raise her protected activity argument

in the district court below, she is barred from raising it on appeal. *See* note 4 *supra.*